Ira Troy COOK, Plaintiff In Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A-12991.

Court of Criminal Appeals of Oklahoma.

Oct. 11, 1961.

Rehearing Denied Jan. 10, 1962.

Second Petition for Rehearing Denied Jan. 24, 1962.

Dave K. Spradling, Oklahoma City, for plaintiff in error.

John L. Smith and Daniel G. Gibbens, Oklahoma City, for plaintiff in error, on appeal only.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

NIX, Presiding Judge.

Ira Troy Cook, who is hereinafter referred to as the defendant, was charged by information in the district court of Oklahoma County with the crime of rape in the first degree. He was found guilty and sentenced to 18 years in the Oklahoma State Penitentiary.

Defendant lodged in this court his appeal within the time prescribed by law. He presents two assignments of error upon which

he relies for reversal. The arguments set forth in the brief are as follows:

"1. Said court erred in overruling the demurrer to the evidence and motion for new trial for the reasons that the verdict and judgment are not substantiated by the evidence and are contrary to law.

"2. Said court erred in overruling the objection of defendant to the argument by the county attorney to the jury."

In discussing the first assignment of error it is necessary to refer briefly to the testimony which defendant contends is insufficient to support the verdict. The testimony discloses that the prosecuting witness was an unmarried minor female 14 years of age at the time of the alleged crime. That on the 28th day of November, 1959, she and one Billy Streetman went to a night club known as Green Top and located in Oklahoma City. That Billy was on the inside while she waited outside in the car. They remained there about two hours. That she left the car and began walking south. A car drove up in which defendant Cook and a companion named Miller were riding. Conversation ensued and the occupants of the car offered to take her home. She got into the car and after the car had been driven a short distance, prosecuting witness testified the following happened:

"Q. All right, what happened then? A. Well, I just started trying to get out of the car and he pulled me back in and hit me in the nose.

"Q. What did he hit you with? A. His fist.

"Q. All right, what happened then? A. And so between the time we got on that dirt road, he picked me up and throwed me over, but mostly just pushed me, when I was in the back seat and he tore my slip off, he didn't tear my slip, tore my pants off, my slip just raised up."

She further testified the following happened:

"Q. And you say he tore your panties off? A. Not off, he tore them, well, tore the crotch out of them and the elastic was still on them.

"Q. What was done with your dress and your slip? A. Well, they were just pulled up.

"Q. Now then, did you offer any resistance to this, Eva, after he hit you in the face? A. Well, I remember saying something about 'quit', I don't know, but he said he would hit me again so I just gave up, I was scared. I just gave up.

"Q. Now then, you heard Mr. Miller testify that he had given you a handkerchief to stop the bleeding, is that right? A. Yes, sir.

"Q. And do you remember when that had taken place? A. Yes, sir, it was right after I was trying to get out of the door before he pushed me in the back seat.

"Q. All right. Now then, after he got you in the back seat, and did you offer him any resistance after you got back there? A. A little, but not very much."

She further stated:

"Q. All right and then after he tore the crotch out of your panties, what position were you in in the back seat? A. Well, I was laying down in the back seat, on the left hand side of the car.

"Q. Your head was on the left hand side? A. Yes, sir.

"Q. You were laying on your back? A. Yes sir.

"Q. All right, and then what happened after that? A. Well, I don't know whether—I mean, I know—I don't know whether it was intercourse or not because he didn't finish, I don't know anything about it that much.

"Q. Let me ask you this, Eva, do you know what male private parts are? A. Yes sir.

"Q. And you know what a female's private parts are? A. Yes, sir.

"Q. Did he insert his private into yours? A. Yes, sir.

"Q. And you say you don't know whether he finished, you mean you don't know whether he arrived at a climax? A. No, sir, I don't know."

Mr. Miller, defendant's companion, substantiated the testimony of the prosecuting witness after she was picked up as follows:

"Q. And tell the jury, then, what happened on your way down the highway. A. Well, Mr. Cook was trying to put his arm around the little lady and she was trying to fight him off, and then the door opened and she tried to jump out and he grabbed her and pulled her back in and he hit her.

"Q. Did you see him hit her? A. Yes, sir.

"Q. What did he hit her with? A. His fist.

"Q. Which one if you know? A. I don't remember, sir.

"Q. Did you see where he hit her? A. No, sir.

"Q. What part of her body was hit? A. In the face.

"Q. Hit in the face? A. Yes sir.

"Q. All right, what happened after that time? A. Well he threw her or pushed her in the back seat, and I was going down that road and I looked over to the right and seen a bunch of lights on the highway and I thought maybe there would be a filling station open over there so we could get the tire fixed, and when I did I stopped and got out of the car to look at the tire, and when I started to get back in, I noticed her purse and I was picking her purse up and I noticed the scout car come up.

"Q. Do you know what the defendant and she were doing after he pushed her in the back seat? A. As far as I know, they were having intercourse.

"Q. And you based that upon what you heard and what you saw and what transpired there? A. The only think I heard was when she mentioned about getting another girl and going to a motel or something. I forgot the name of it now.

"Q. Now, then, was that during her conversation with Cook? A. All I could hear, yes, sir.

"Q. And, was she—do you know whether they had any conversation about having sex relations? A. No sir, not that I know of.

"Q. You didn't hear anything specific, is that right? A. No sir.

"Q. And did you actually see what he did after he pushed her in the back seat, through the rear view mirror? A. Well from what I noticed, they were having it.

"Q. They were having what? A. Sexual intercourse."

On cross-examination Mr. Miller testified as follows:

"Oh, they were talking. Now, were they having intercourse or were they talking? A. Just like I told the man there, as far as I could see, I heard a few words and I told him what they were, and as far as I could tell, they were having intercourse.

"Q. But you, of your own knowledge, you don't know whether they were or weren't, do you? A. They showed the movements of it, yes, sir.

"Q. Did you try to pull Cook out of the back seat? A. No sir, I sure didn't."

Officer Bachofer testified he received a call from the dispatcher at the FAA Center and proceeded to SW 59th street, parked in front of the vehicle in which the defendant was situated. That Miller was standing outside the car, picking up stuff off the ground. The testimony in that regard was as follows:

"Q. (By Mr. Gregory) Where was the Defendant Cook during the time of that conversation? A. He was in the back seat on the right hand side of the car and the girl was on the left side of the car.

"Q. And about how far was he from you at the time of your conversation with Miller? A. I was standing by the door and he was directly in the back seat.

"Q. And did you ever have any conversation with him? A. Yes, him and Miller answered at the same time, nothing was wrong, that they were just parking out there, and she had kicked her purse over.

"Q. All right, what happened then at that time? A. The girl kept looking at me in the eye and shaking her head, 'No', something was wrong, and that aroused my suspicion and I asked them to get out of the car.

"Q. Could you at that time see the girl clearly? A. Yes, sir.

"Q. Did you notice anything unusual about her appearance? A. Yes sir; her nose was bleeding and her lip was bruised and she was bleeding at the mouth, and she had a handkerchief.

"Q. All right, and then did they all get out of the car? A. Yes, sir.

"Q. All right, then what happened after that? A. When the girl got out, she fell down on the ground, I made the men get in front of the car where I could see them, and I carried her back to the police car.

"Q. And where was the defendant during that period of time? A. He was in front of the car, and I had them over the front of the hood of the car, over the front of their car.

"Q. And where did you take the little girl? A. I put her in the back seat of the patrol car.

"Q. Now then, was there anything else about her condition at that time that you noticed? A. Well, she started crying and then she was hysterical, I couldn't even make sense out of her, so I called the dispatcher and asked for an ambulance.

"Q. And did you make any effort at that time to talk with her about what had happened? A. She told me that they had raped her."

The officer then called an ambulance in which the girl was taken to the hospital. The state produced Dr. Harry C. Wallhon who examined the prosecuting witness after she arrived at Mercy Hospital, and testified as follows:

"Q. I will ask you this, first, doctor: would you please describe, briefly, the external appearance of this girl prior to her medical examination? A. Well, she was rather bruised up and beaten up as if she had been struggling and there was blood on her clothing, and of course, needless to say, she was upset, emotionally.

"Q. Did you detect any odor of intoxication beverages, or did you observe her to be under influence of intoxicating beverage? A. Yes, I could tell that she was.

"Q. I will ask you if at that time, doctor, if you * * * did you make a medical examination of the girl? A. Yes, I did.

"Q. And would you please state in detail as much as you can what that examination consisted of and what your findings were? A. The examination consisted of a pelvic examination and a smear.

"Q. By a pelvic examination, do you mean a physical examination of the pelvic area? A. That is correct.

"Q. And by a 'smear', do you mean that is placed under a microscope to determine * * *. A. To determine the presence of sperm.

"Q. Now, first of all the pelvic: what did it disclose? A. It disclosed the evidence of trauma.

"Q. By that, do you mean injuries? A. Yes, injuries, bruises, small bruises, and lacerations.

"Q. And would you please describe where these bruises and lacerations

were? A. They were about the private parts.

"Q. Now, what else, doctor? A. Well, the examination disclosed further that there was some blushing inside * * *.

"Q. Alright * * *. A. (continuing) It did not, however, reveal any sperm when we took the smear.

"Q. Did you test that? A. I tested it myself.

"Q. And from the smear you say it did not detect any male sperm? A. That's correct.

"Q. Now, then was there any treatment given for the injuries? A. No, there was no treatment necessary for that.

"Q. They were not of a serious nature and did not have to be treated? A. That's right.

"Q. Now then, from your examination were you able to develop any opinion as to whether or not this girl had had any previous sexual experience? A. That would be difficult to determine.

"Q. Under the circumstances? A. Right.

"Q. Now, based upon the examination you made, do you have an opinion now, and did you at that time, as to whether she had had on that evening or shortly before your examination whether she had had any sexual intercourse? A. Certainly there was some evidence that she had been molested.

"Q. That's all."

This in substance constituted the state's case.

The defendant denied hitting the girl and emphatically denied having had intercourse with her. He produced witness as to his good reputation and also witness who testified that prosecuting witness had told them subsequent to the alleged rape and prior to trial that she was so drunk that she didn't know whether she was raped or not.

Defendant's case was impressive and in many instances discredits the testimony of the prosecuting witness. It is not necessary to relate defendant's testimony in detail as the only question with which this Court is concerned in proposition one is whether or not there was any competent evidence upon which the jury could base their verdict. The testimony presents a drastic conflict between the case of defendant and that of the state. The jury was the sole judge of the testimony. It was within their exclusive province to weigh the testimony and ferret out the truth. Quite obviously they chose to believe the testimony of the prosecuting witness rather than that of the defendant. This court has consistently held in conformity with the rule laid down in the case of Sholes v. State, 97 Okl.Cr. 158, 260 P.2d 440, 442, wherein it was stated:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, this court will not interfere with verdict even if there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts."

Defendant contends that the testimony of the prosecuting witness stood uncorroborated. With this the court does not agree. Witness Miller substantiated her testimony in that she attempted to jump out of the car. That defendant pulled her back in, hit her with his fist and threw or pushed her into the back seat and from what he saw they were having intercourse. Officer Bachofer likewise supported her testimony in that he observed the appearance of the girl when she stepped from the car. Her nose was bleeding and her lip was bruised and she was bleeding at the mouth, was hysterical and said they had raped her. The doctor's testimony revealed injury and

trauma on the face and private region. Though the doctor testified there was no indication of male sperm this would not preclude penetration as a climax may not have been reached or contraceptives may have been employed.

■ The only element of first degree rape that appears to your writer questionable is that of the force used and the resistance offered. Though the courts have held that the law no longer requires women threatened with rape to resist to the uttermost, and does not require that a woman shall do more than her age, strength, the surrounding circumstances make it reasonable for her to do in order to manifest her opposition. See Kidd v. State, 97 Okl.Cr. 415, 266 P.2d 992.

■ The Court must take into consideration that the victim was only 14 years of age, evidently under the influence of alcohol. She was with strange persons at night in an isolated place. According to her testimony she was kept from leaving the car, struck in the nose with defendant's fist and shoved in the back seat where the alleged act occurred.

Her testimony as to the only resistance offered was as follows:

"Q. Now then, did you offer any resistance to his, Eva, after he hit you in the face? A. Well, I remember saying something about 'quit', I don't know, but he said he would hit me again so I just gave * * * I was scared, I just gave up."

Also,

"Q. All right, now then, after he got you in the back seat, and did you offer him any resistance after you got back there? A. A little, not much."

This Court said in the case of Reid v. State, Okl.Cr., 290 P.2d 775, 783:

To constitute resistance in good faith to alleged rape, resistance must have commenced at inception of advance and must have continued until the offense was consummated * * * resistance by mere words to alleged rape is not sufficient, but such resistance must be by acts, and must be reasonably proportionate to the strength and opportunities of the woman.

The Court is of the opinion that in view of the evidence as to force and resistance the jury's verdict would have been predicated upon more solid ground had defendant been found guilty of rape in the second degree. Our statute (21 O.S.1951 § 1111 et seq.) provides that sexual intercourse by a male over eighteen years of age, with a female of the age of 14 and under 16 years of age, even though the female consents, is rape in the second degree, carrying with it as punishment from 1 to 15 years imprisonment.

■ Defendant next complains of improper remarks made to the jury in the closing argument of the county attorney. The argument complained of was as follows:

"Now, one other argument has been submitted to you which is as old as the legal profession, ladies and gentlemen, here is the argument as we lawyers call, "the missing witness" argument. In other words, the defense gets up and rants and raves and says, 'why didn't they bring in this man? Why didn't they bring in this evidence, if they had it? If it was there? If it had any bearing on the case, certainly it must have helped my client or they wouldn't have tried to hide it'. Now, since Mr. Spradling has inquired and asked the questions concerning this little girl's clothing, I am going to tell you: in so far as I know, it is in the custody of the man who is seriously ill in the * * the state chemist and it was sent to him for analysis before he had a serious car wreck. That is why it was not brought into this courtroom and we were not trying to hide anything."

The record fails to show an objection at the time the argument was made. However, in the rear of the transcript there appears an insertion titled "Request for

'Amendment to Case-made and Order". The body of said instrument is as follows:

"Comes Now The Defendant, Ira Troy Cook, and requests that the case-made filed and on file herein be amended in the following manner and at the place indicated, to-wit:

"1. On page 12, paragraph 2, of the closing argument of the County Attorney reference and comment is made as to the clothing of the Prosecutrix which was not introduced in evidence:

"Objection:

"Comes now the Defendant by and through his Attorney, Dave K. Spradling, to interpose an objection to the remarks of the County Attorney concerning the clothing of the Prosecutrix which was not introduced in evidence. This reference and comment is tantamount to an introduction of the clothing in evidence after the case is closed; is highly prejudicial and inflammatory, and the Defendant asks that such comment and reference be stricken from the Record and the Jury be instructed to completely disregard the same.

"Overruled.

"Exception saved.

"2. On Page 12, Paragraphs 2 and 3, of the closing argument of the county attorney reference is made to the 'missing witness,' and the comment and remarks of the County Attorney are such as to lead the Jury to believe that the State had many witnesses and much testimony of a damaging nature to the defendant, which it was not deemed necessary to introduce:

"Objection:

"Comes now the Defendant by and through his Attorney, Dave K. Spradling, to interpose an objection to the remarks of the County Attorney concerning the 'missing witness'. This comment is tantamount to the introduction of such testimony from such unknown witnesses, is highly prejudicial and inflammatory and the defendant asks that such comment be stricken from the Record and that the Jury be instructed to completely disregard the same.

"Overruled.

"Exception saved.

"/s/ Dave K. Spradling
Attorney for the Defendant.

"The above amendments are approved this 25 day of November, 1960.

"Dave K. Spradling /s/
Attorney for Defendant

"Glen O. Morris /s/
Glen O. Morris, Trial Judge

"I, Dale Smith, Court Clerk for Oklahoma County, hereby certify that the foregoing is a true, correct and complete copy of the instructions herewith set out as appears of record in the District Court Clerk's office of Oklahoma County, Okla., this 25 day of Nov. 1960.

"Dale Smith, Court Clerk
By W. H. Regian /s/ Deputy"

Bear in mind that the instrument was signed by the court and filed with the court clerk on the 25th of November, 1960. The record shows that on October 31, 1960 the court gave defendant until November 7, 1960 to make and serve case made, plaintiff to have 3 days thereafter to suggest amendments, same to be settled in 3 days notice of writing by other party. On the 14th day of October, Jean Cason, official reporter, certified that she transcribed her notes in the case and the record contains a full, true and correct and complete transcript of all the evidence introduced and offered in said trial, and other proceedings had at said hearing. The record shows that on November 22, 1960 there was a stipulation filed of record, signed by defense counsel and counsel for the state, stipulating and agreeing that the record was a true and correct record of all the pleadings filed, all motions, all rulings and orders and all exceptions taken to such rulings. The record contains a certificate certifying its accuracy on November 22, 1960 by Judge Morris, the trial

judge. The instrument attempting to amend the case made was filed 3 days later. There does not appear of record any notice to the adverse party. There is no contention that the objection was made during the course of the trial, but appears to be an addition, not continuance, in the record of the trial. There is no allegation in the application that an objection was made during the trial. This appears to be an attempt to amend the case made by an addition of something that did not happen. Any person desiring to appeal is the sponsor of the case made. It is his duty to prepare and serve a case made upon the county attorney. The proper time to add anything omitted by the court reporter, or to submit a different version as to what happened, is prior to submission to the county attorney, calling the county attorney's attention to the addition or any changes so that if he has any different version he may suggest amendments. See Ridenour v. State, 94 Okl.Cr. 492, 98, 231 P.2d 395. The Ridenour case, supra, further states in substance that where the court has certified the case made this Court will assume that appellants apparently followed the law in preparation of the same and the certificate of the court attesting to the correctness of the record, in absence of fraud will be treated as conclusive. This court has been liberal in the application of this rule because an appellant is entitled for the record to speak the truth. However, there is absolutely no evidence in the instant case that the objections were made or offered at time of the trial.

 This court has consistently held that where improper remarks are made it is the duty of defense counsel to immediately impose an objection and a request made to instruct the jury that the remarks are improper and not to be considered by them. See Conway v. State, Okl.Cr., 320 P.2d 419; Young v. State, Okl.Cr., 357 P.2d 562.

 The remarks complained of were no doubt improper and presented evidence to the jury not supported by the sworn testimony. It is quite obvious that they were in answer to the inquiry of defense counsel in his argument to the jury. The argument of defense counsel was not shown in the case made. This court said in the case of Grooms v. State, 77 Okl.Cr. 448, 142 P.2d 862, 864:

"Ordinarily, error cannot be predicated on mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel." Herren v. State, 74 Okl.Cr. 424, 127 P.2d 384, 215.

A thorough review of the record convinces the court that the evidence is ample to support the jury's verdict of guilty and that there is no error sufficient to justify reversal. However, because of the weakness of testimony as to resistance we feel justice would better prevail if the judgment and sentence of the trial court was modified to rape in the second degree and the punishment reduced to 15 years in the Oklahoma State Penitentiary.

BRETT and BUSSEY, JJ., concur.