John Bennett **LEWELLYN**, Plaintiff in Error,

v.

The **STATE** of Oklahoma, Defendant in Error.

No. A–16491.

Court of Criminal Appeals of Oklahoma.

Sept. 1, 1971.

Rehearing Denied Oct. 21, 1971.

**512**

Frank R. Courbois, Oklahoma City, for plaintiff in error.

Larry Derryberry, Atty. Gen., Yvonne Sparger, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge.

John Bennett Lewellyn, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Oklahoma County, Oklahoma for the offense of Possession of Marihuana; punishment was fixed at seven (7) years imprisonment, and a fine of Five Thousand Dollars ($5,000), and from said judgment and sentence, a timely appeal has been perfected to this Court.

Briefly stated, the evidence at the trial adduced that at approximately 6:00 o'clock p. m., on May 27, 1970, Deputy Larkin Lamb, accompanied by three other deputy sheriffs and two police officers, went to the residence of the defendant to execute a search warrant. They seized certain exhibits, which were later identified by John McAuliff, a chemist for the Oklahoma State Bureau of Investigation, as marihuana.

David Crosslin, a co-defendant, testified that at the Preliminary Hearing the defendant testified that he owned all the marihuana and LSD that was found in his home. He denied on cross-examination that any deal had been made to testify against the defendant.

Douglas Lyon, another co-defendant, testified that he was also present at the Preliminary Hearing, and that the defendant testified that all the marihuana present was his, and that none belonged to the other persons. He testified on cross-examination that he was aware that the defendant's residence was a church, and that he understood that it would go easier with him if he testified against the defendant. He testified that he had observed church services at the defendant's residence.

The defendant duly elected to represent himself. He testified that he was previously known as John Lewellyn, but was now "John L.-Aquarias," a priest in the Universal Life Church, Inc. He testified that he used marihuana openly, preached marihuana in his services, and that marihuana was a sacrament in his church. His church, to some extent, had substituted

marihuana for sacramental wine. He testified that he attempted to get himself arrested by using marihuana openly, because he wished to confront the law on this subject, and that the state of this country was in such a terrible shape that he was willing to put his life in jeopardy to work with young people.

On cross-examination, the defendant testified that he was an ordained minister of the Universal Life Church, Inc., and that he obtained his ordination certificate through the mail, and there was no course of study required to be ordained. He testified that, in some form, he advocated the change of all our universities, as well as free sex, free love, and free drugs. He further testified that he believed it was proper for a member of his church to use any substance whatsoever, marihuana, LSD, or heroin, if that person thinks the substance will bring him into a closer relationship with God. He testified that while he was working as an undercover agent for the District Attorney's office in Amarillo, Texas, he was convicted for the offense of Possession of Marihuana, and sentenced to three to five years imprisonment. He spent a total of fifty-six (56) days in the penitentiary, and was released and given a full pardon by the Governor. He further testified that he was convicted in California for Indecent Exposure.

Bruce Nolan testified that he was a minister of the "Day Church" and was ordained through Christ by God's Spirit. He testified that he considered the defendant to be a priest, because the defendant was noble in his purpose in trying to help other people to become aware of God and in not denying anybody their way of coming to the Word of God. (Tr. 55) On cross-examination, he testified that he did not have any formal education to become a priest, that he meditated and became a priest because he desired to be one. He testified that he had used marihuana with the defendant.

Vance Simpson, also a priest in the Universal Life Church, and a priest in the "Day Church," testified that he became a priest by mail order. He considered the defendant to be a priest, or anyone a priest, who wants to help others find their way toward God. He admitted that he smoked marihuana. He testified that neither he, the defendant, nor any group connected with them, advocated the overthrow of the government. He put his belief and his conscience above the law, and did not believe in violence, war, or killing, but in love and peace.

Michael Moore testified that he was a priest of the "Day Church," and that there was no formal training required to become a priest in his church.

Raymond Wilson testified that he was a member of the Neo-American Church. He stated that the Neo-American Church is a church of the American Indians, and that one must be over twenty-five per cent (25%) Indian blood to qualify as a member of the church. He testified that the main sacrament in his church was the use of the peyote plant and peyote derivates, which had been used in his church before white men came to this country.

Crystal Martin testified that she lived at the "Day Church" and was employed of God. (Tr. 81) She stated that the only requirement for ordination was what one considered in his mind, and that Jesus Christ did not walk around with a paper to show that he was ordained. She testified on cross-examination that she believed that if people need to use drugs or anything else as a medium to reach God, they should be able to use them.

Eugene Morrell, a minister in the Pentecostal Church, testified that he had heard the defendant referred to as "Father John" and was under the impression that Father John was highly thought of by the young people in the Paseo area because of his counseling through spiritual and moral guidance. (Tr. 99) He further testified that he had only known the defendant three or four weeks.

Patricia Williams, an employee of a boutique located in the Paseo area, testified

that she had known the defendant approximately one month and referred to him as Father John. She testified that she called him "Father John" because, "I feel his goodness, because he came down to the street and shares our life with us and he ministers to us." (Tr. 104) She testified that the defendant had given her back a belief in God that she had lost, that she had discussed drugs with the defendant, and that they were opposed to heroin, or "smack" and "speed." In cross-examination, she testified that she favored giving marihuana to children, but was opposed to giving LSD to children, as it was a little strong. She testified that she would want marihuana for her child, like she would feed him milk. (Tr. 108)

Defendant asserts seven propositions of error, only four of which we deem to be of sufficient merit to warrant discussion in this Opinion. Defendant's propositions one, two, five, and seven all generally allege error during the trial concerning improper questions by the District Attorney and the admission into evidence of prejudicial exhibits. We need only to observe that the Record does not reflect that the defendant objected to the questions propounded by the District Attorney, nor did he object to the admission of the physical evidence. We have previously held that where no specific objections were made to the admission of evidence in the trial court, objection may not be raised for the first time on appeal, unless error assigned raises a jurisdictional question. Thompson v. State, Okl.Cr., 453 P.2d 134 (1969).

We have carefully examined the alleged improper questions purported by the District Attorney, and the introduction of the alleged prejudicial exhibits, and are of the opinion that the same do not constitute reversible error.

The next proposition contends that the constitutional requirement of fair process and substantial equality were not met in the trial, in that the defendant did not have effective assistance of counsel. The Record reflects that, although a Public De-

fender was present in the court room to represent the defendant, the defendant chose to represent himself. Defendant made his opening statement in representing himself in his own direct examination. The Record reflects that the court interrupted the defendant during his direct testimony and stated:

"THE COURT: I think you had better let your counsel examine you on that.

"A. He has no familiarity, Your Honor. I will do it, and I am sorry. * * * I think I can keep it within this now.

"MR. BRITTON: Now, at the outset of this hearing, you advised me and you advised Mr. Anderson who is the director of the Public Defender's Office, that you did not desire an attorney.

"Now is that still your opinion?

"A. Yes, sir." (Tr. 38)

The Record further reflects that the defendant again refused the assistance of counsel during a later stage of his trial:

"THE COURT: And you explained to Judge Mills and myself that you felt you were competent to represent yourself and didn't want the aid of the Public Defender and you discharged your previously hired private counsel.

"MR. LEWELLYN: That is correct." (Tr. 53)

In Richardson v. State, 61 Okl.Cr. 278, 67 P.2d 804, we stated:

"The record shows that the court had appointed counsel for the defendant when he came into court and advised the court that he did not want counsel, and counsel was then permitted to withdraw from the case. As disclosed by the record, the court did not deny the defendant counsel, or refuse to appoint counsel for him, and the defendant in open court refused to permit counsel appointed to try his case. There is an old adage, which has a great deal of truth in it, 'That when a defendant elects to try his case and not accept the aid of counsel, he has a fool for a client.' "

See also Ex parte Cornell, 87 Okl.Cr. 2, 193 P.2d 904, and Ex parte McCombs, 204 Okl.Cr. 693, 234 P.2d 953.

■ We are of the opinion that the defendant, an adult person, with prior knowledge of criminal procedure, knowingly refused representation of counsel and elected to represent himself. To permit a person who knowingly elected to represent himself, and then on appeal, raises the question of competency of counsel, would be a mockery of our system of criminal jurisprudence. As we stated in Ex parte McComb, *supra*:

"Having rejected aid of counsel when such aid was tendered him and having elected to represent himself he can blame no one other than himself * * *"

■ The next proposition asserts that the defendant was deprived of his constitutional rights in that he was not afforded a transcript of the trial proceedings in adequate compliance with the United States Constitution, the Oklahoma Statutes, and a recent Supreme Court decision. Defendant argues that, although he was furnished a "transcript," that he was prejudiced in that the transcript did not include the complete proceedings of the trial, specifically the voir dire examination, and the closing arguments. He further argues that the voir dire examination and the closing arguments are not included in the transcript. This Court is not able to review same to ascertain whether or not prejudicial error was committed therein. We observe that the Record does not reflect that the defendant requested the voir dire examination, nor the closing arguments, to be transcribed by a court reporter; nor, does the Record reflect that the defendant's present attorney filed a Motion to Supplement the Record in order that portions of the trial proceedings, of which he now complains are missing, might be included. We have previously held that any person desiring to appeal is sponsor of the case-made, and it is his duty to prepare and serve a case-made upon the County Attorney, and the proper time to add anything omitted by the court reporter, or to submit a different version of what happened, is prior to submission to the County Attorney. Cook v. State, Okl. Cr., 367 P.2d 730 (1961). We, therefore, find this proposition to be without merit.

■ The next proposition asserts that the application of O.S. 63, §§ 451, 452, prohibiting the possession and use of marihuana, is inconsistent with the first amendment guarantees of free exercise of religion. Defendant argues that the possession and use of marihuana is an integral and essential part of his religion and church, that it is not only incident to his practice of religion, but also is a teacher and a way and direction for the defendant and his followers to find their truth in God.

· In the landmark case dealing with religious freedom, Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), the Supreme Court, in denying Mormons an exception from anti-bigamy laws, said:

"Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions. [sic] they may with practices."

The Court recognizes that religious practice could not be accepted as justification for an overt criminal act. To permit a man to excuse unlawful practices because of his religious belief "* * * would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

The concern of this Court is not only for the religious freedom of the defendant, guaranteed by the Constitution, but also for the laws of the State of Oklahoma, which defendant admittedly, knowingly, and purposefully violated because they conflicted with his personal religious beliefs and practices. Defendant advocates the use of marihuana, in that "it brings a person closer to God, makes him less violent, more peaceful, and more loving toward his brother man." We do not inquire in the

**516**

truth or veracity of defendant's religious beliefs, since the same is not at issue here. We are of the opinion that the danger is too great, especially to the youth of this state at a time when the psychedellic experience is the "in thing" to so many, for this Court to yield to the arguments that the use of marihuana, for so-called religious purposes, should be permitted under the free exercise clause.

We are of the opinion that the use of marihuana imposes a substantial risk to health and life, and that there is no possible justification for the use of same in the name of religious freedom.

■ The final proposition asserts that the punishment imposed by the court is excessive, is constitutionally defective, and violates the equal protection clause of the Fourteenth Amendment of the United States Constitution, and is, therefore, void. Defendant argues under this proposition that he is a pauper, has no income, and has no way of paying the $5,000 fine that was assessed against him by the trial court. Defendant cites the recent case of Tate v. Short, 401 U.S. 395, 91 S.Ct. 688, 28 L.Ed. 2d 130 (1971), wherein the United States Supreme Court held that imprisonment for satisfaction for a fine assessed against him denied him an equal protection under the law.

The Attorney General argues in his Brief that there is no showing that the defendant would, in fact, be indigent at the conclusion of his imprisonment, and that it would be improper for this Court to rule upon a future condition which might or might not happen. This contention by the Attorney General is well-taken; however, we are of the opinion that justice would best be served by modifying the judgment and sentence to imprisonment for a term of seven (7) years, and as modified, the judgment and sentence is affirmed.

NIX and BRETT, JJ., concur.