## MRS. L. D. McMASTERS v. STATE.

No. A-3747.     Opinion Filed June 13, 1922.
(207 Pac. 567.)

(Syllabus.)

1. **Constitutional Law—Police Power—Regulation of Practice of Communicating with Departed Spirits Through a "Medium" for Hire.** The regulation or suppression of the art, practice, or profession of communicating with departed spirits by a person known as a "medium" while in a state of trance, who imparts such communications for hire, whether it be done pursuant to a system of philosophy, religion, legerdemain, or metaphysical science, is within the police power of the state.

2. **Same—Practice not Protected by Constitutional Provisions Relating to Free Exercise of Religion.** Assuming that the practice of communicating with departed spirits is a part of an established religion, such practice, if inimical to the good order and general welfare of the community or in conflict with the general penal laws, is not within the purview of the provisions of the federal and state Constitutions, relating to the establishment of religion or the free exercise thereof.

3. **Disorderly Conduct—Fortune Telling—Whether Practice of Spiritualistic Communication Should Be Classified as Religious Held not Ascertainable.** Whether the practice of spiritualistic communications should be classified as religious or philosophical, or is a kind of speculative psychic phenomenon or exercise, cannot be conclusively ascertained from this record.

4.  Constitutional Law—Statutes May Not Interfere with Religious Beliefs, but with Practices. Laws are made for the government of actions, and, while they cannot interefere with mere religious beliefs, they may with practices.

Appeal from County Court, Oklahoma County; W. R. Taylor, Judge.

Mrs. L. D. McMasters was convicted of fortune telling, and she appeals. Affirmed.

Gustave A. Erixon, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty Gen., for the State.

BESSEY, J.  This action is an outgrowth of an alleged spiritualistic "reading" by a "medium" in a state of trance, purporting to convey a message to one Bessie Jones from the spirit of Minnehaha, a legendary Indian girl as found in Longfellow's poem Hiawatha. Bessie Jones, an attache of the county attorney's office, for the purpose of laying a foundation for the prosecution, went to the residence of the medium, Mrs. McMasters, in Oklahoma City, and there solicited the reading, which was given in consideration of the payment of $1. The medium, after going into a trance, got into communication with the departed spirit of Minnehaha, and conveyed to Miss Jones a message, part of which was as follows:

"Q.  What did she say? A. That I wasn't working at the present time, but that I was going to have a job offered me right away, a good job, and that I would take it; and then she said I was going to take a trip right away. And she said I was going to meet a blond fellow—a blond-headed fellow—and also a black-headed fellow, and that this blond-headed fellow would come between me and the black-headed fellow, and that I was going to marry a wealthy man—

"Q.  Did she make any charge for that information? A. Yes, sir; she did.

"Q. State what else she did when you got ready to leave. A. When I got ready to leave she gave me six calling cards.

"Q. Did she ask you to do anything with them? A. No, sir. She gave me six calling cards and asked or said for me to give them to my friends."

The statute under which this prosecution was brought (section 1, chapter 59, Session Laws of 1915) is as follows:

"It shall be unlawful for any person or persons, pretending or professing to tell fortunes by the use of any subtle craft, means or device whatsoever, either by palmistry, clairvoyancy or otherwise, plying his or her trade, art or profession within the state of Oklahoma, to make any charge therefor either directly or indirectly, or to receive any gift, donation or subscription by any means whatsoever for the same."

For a violation of this statute a minimum penalty is provided of a fine in any sum not less than $50 and imprisonment for not less than 30 days. In this case the defendant was given the minimum punishment.

It is earnestly contended by defendant's attorney, in an exhaustive and well-written brief, that this sentence should be set aside on the constitutional ground that her arrest and conviction were unlawful, as an interference with the free exercise of her religious beliefs and practices; that for a number of years she had been a member of the National Spiritualist Association, incorporated under the laws of the state of Oklahoma, and that she was regularly licensed to give spiritual advice to others; that many of the tenets, beliefs and practices of this cult are religious in their nature, including the practice of communicating with departed spirits.

The declarations and principles, as contained in the constitution and by-laws of this association, are as follows:

(1)  A belief in infinite intelligence.

(2) That the various manifestations of nature's laws, physical or spiritual, are the expression of this infinite intelligence.

(3) That a correct understanding of nature's laws and living in harmony therewith is enjoined upon its members.

(4) A belief in the continuity and individuality of existence after death and the possibility of communication with departed spirits.

(5) A belief in the Golden Rule.

(6) That each individual's happiness and moral responsibility is dependent upon obedience to nature's psychic laws.

(7) That the privilege of reformation is continuous here, as well as in the hereafter.

Other excerpts from the constitution are as follows:

"The objects of said association shall be the organization of the various spiritual societies of the United States into one general association for promoting mutual aid and co-operation in the benevolent, charitable, educational, literary, musical, scientific, religious and missionary purposes and enterprises germane to the phenomena, science, philosophy, and religion of Spiritualism."

death, as furnishing advice and spiritual instruction for our guidance, moral development and physical well-being; and that, to insure the best results, our mediums need protection and encouragement, and, in cases of indigence, financial aid; therefore, special funds should be set aside for such purpose,

"The ministry of Spiritualism shall consist of three ualism, as giving proofs of the continuity of life after so-called under the supervision of the board of trustees."
."We recognize mediumship as the foundation of 'Spirit- classes, to wit: Pastors, licentiates and associate ministers."

Ever since the dawn of history there have been those who have believed in the influence of good and evil spirits. The devil himself was a fallen angel, cast out of heaven. If, then, both good and evil spirits communicate with men, the character of the spirit messages will necessarily vary accordingly. Women desiring information concerning their amours should consult the spirit of Ruth, of Delilah, or of Cleopatra; men might well inquire of the spirit of King Solomon, of Henry the Eighth, or of Aaron Burr.

The writings of Dante, of Shakespeare and of Milton, as well as of the modern poets, abound with examples of the belief in spirits.

"Aerial spirits, by great Jove designed
To be on earth the guardians of mankind;
Invisible to mortal eyes they go,
And make our actions good or bad below.
They can reward with glory or with gold—
A power they by divine permission hold."
—Hesiod.

"The spirits perverse, with easy intercourse,
Pass to and fro to tempt or punish mortals."
—Milton.

Since both the federal and state Constitutions forbid the abridging of the freedom of conscience and religious liberty, we are confronted with a question whether, as a matter of law, the beliefs and practices of Spiritualism, as shown by this record, constitute a religion within the meaning of the federal and state Constitutions; and whether, if it is a religion, the practice of communicating with departed spirits through a spiritualist medium is within the purview and protection of the Constitution.

It has been held that "religion" has reference to man's relation to Divinity; to reverence, worship, obedience, and

submission to the mandates and precepts of supernatural or superior beings. In its broadest sense it includes all forms of belief in the existence of superior beings, exercising power over human beings by volition, imposing rules of conduct with future rewards and punishments. Davis v. Beason, 133 U. S. 333, 10 Sup. Ct. 299, 33 L. Ed. 637; 4 Words and Phrases, Second Series, p. 253; People v. Board of Education, 245 Ill. 334, 92 N. E. 251, 29 L. R. A. (N. S.) 442, 19 Ann. Cas. 220; State v. Amana Society, 132 Iowa, 304, 109 N. W. 894, 8 L. R. A. (N. S.) 909, 11 Ann. Cas. 231.

Applying these definitions and authorities to the facts shown by this record, we admit our inability to decide conclusively whether this is a religion, or whether it is a mere philosophy or a system of metaphysical speculation. We are inclined to lean toward the latter view, but we have not been sufficiently advised to decide that point. We do affirm that this record tends to show that, whether religious in its nature or not, it is a system of speculative philosophy, attended with superstitious credulity and in the instant case tinged with hypocrisy. This association prescribes no confession of religious faith; no rules of conduct, directing what its members shall do or refrain from doing, except as before stated. Its principles of philanthropy and its belief in the Golden Rule would apply to the Masonic Order, the Elks, the Rotary Club, or the Boy Scouts, and like organizations, none of which are considered religious organizations.

But, assuming that it is a religion, religious liberty does not include the right to introduce and carry out every scheme or purpose which persons see fit to claim as a part of their religious system. No one can stretch his liberty so as to interfere with that of his neighbor, or violate police regulations or the penal laws of the land, enacted for the good order and general welfare of all the people. Liberty founded by the

fathers was not license unrestrained by law. Owens v. State, 6 Okla. Cr. 110, 116 Pac. 345, 36 L. R. A. (N. S.) 633, Ann. Cas. 1913B, 1218; Davis v. Beason, supra; Frazee Case, 63 Mich. 396, 30 N. W. 72, 6 Am. St. Rep. 310; Murphy v. Ramsey, 114 U. S. 15, 5 Sup. Ct. 747, 29 L. Ed. 47; State v. Neitzel, 69 Wash. 567, 125 Pac. 939, 43 L. R. A. (N. S.) 203, Ann. Cas. 1914A, 899.

In the Davis Case Mr. Justice Field, quoting Mr. Justice Waite in an earlier case (Reynolds v. U. S., 98 U. S. 145, 25 L. Ed. 244), said:

"There have been sects which denied as a part of their religious tenets that there should be any marriage tie, and advocated promiscuous intercourse of the sexes as prompted by the passions of their members. * * * Laws are made for the government of actions, and while they cannot interfere with mere religious beliefs, * * * they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or, if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice? So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

Even if the purposes of this organization are religious in their nature, it is difficult to see how the practice of giving "readings" or telling fortunes concerning the mating inclinations of men and women could be religious, in any sense.

This medium, while in a trance and assuming to speak for Minnehaha, told Bessie Jones, whom she supposed to be a lovelorn girl, that she would soon meet an attractive blond boy, and that later a brunette would supplant him in her affections; that she would soon go on a long journey; that she would eventually marry a man of wealth, etc. All of which sounds very secular to this court. It seems very like a Gypsy fortune teller, or the reading of the palm by some wrinkled old hag, or the interpretations of a crystal gazer in a freak side show. Doubtless it was this species of hypocrisy and legerdemain that this statute was intended to suppress. An innocent practice or entertainment, whether of a religious nature or not, may be regulated or suppressed where the tendencies and temptations to pervert it into evil channels is manifest, and where the evil is likely to overbalance the good. Fantastic philosophers and religious zealots, like other people, must conform to wholesome police regulations. 6 R. C. L. Constitutional Law, § 237.

On the other hand, there have been and now are many persons of extraordinarily high mentality and intelligence who implicitly believe that communication can be had with departed spirits through a spiritualist medium. One of the most prominent adherents of this faith, A. Conan Doyle (who should not be confused with Thomas H. Doyle, presiding judge of this court), claims that departed souls are enveloped with a kind of external body, capable of being photographed, and that such photographs are in existence; also, that he has the physical writing of a letter written by a spirit friend. Maybe so—but, like Bessie, the stool pigeon, we are somewhat skeptical.

It is not for this court, however, to judge of the merits or demerits of philosophies, cults, or religions; we are expected to decide the law so far as it relates to the concrete

facts shown in this record. The legendary Minnehaha never existed in the flesh; hence a continuity of her spirit cannot exist in the spirit world. Unlike Conan Doyle, this medium produced no photograph of the spirit of Minnehaha. Her identity was not established. Some unknown, playful spirit may have deceived the medium, or she may have intended to deceive her client Bessie. Hiawatha and Minnehaha were creatures of the imagination of the poet Longfellow. It is a pretty, fascinating love poem, with a natural appeal to girls who long for romance in love. For example:

"As unto the bow the cord is,
So unto the man is woman.
Though she bends him, she obeys him,
Though she draws him, yet she follows—
Useless each without the other.
Thus the youthful Hiawatha,
Said within himself and pondered,
Much perplexed by various feelings;
Listless, longing, hoping, fearing,
Dreaming still of Minnehaha,
Of the lovely Laughing Water
In the land of the Dakotas."

If sure of her identity, it would be well worth a dollar of any girl's money to have the benefit of the advice of the sparkling, romantic spirit of Minnehaha.

But the unrestrained practice of this art, or whatever it may be, is susceptible of abuse within the power of the Legislature to suppress. Its mandates, within constitutional limitations, bind this court. Appeals to the spirit world might avail before the case reaches us, but here we have no jurisdiction over any spirits except those banned by the prohibitory law, such as "Bourbon," "Mountain Dew," "Forked Lightning," and like distillates—like those in the spirit world, some good and some bad.

The only practical appeal remaining is an appeal to the Governor, for executive clemency. Since no one was injured, we feel that executive clemency would be proper, at least to the extent of setting aside the jail sentence. The sentence imposed was the minimum provided by law, so that this court, on affirmance, is powerless to modify it. This case, on the law and the facts, should be affirmed; and it is so ordered.

DOYLE, P. J., and MATSON, J., concur.

MATSON, J. (concurring).   While A. Conan Doyle should not be confused "with Thomas H. Doyle, presiding judge of this court," neither should Bessie, the medium's patron, be confused with E. S. Bessey, associate judge of this court and writer of the opinion. I am reliably informed that there is no relationship either by affinity or consanguinity between either of the Doyles or either of the Besseys.

Verily, the spirit of regulation is abroad in the land. For some time most of the states have been regulating the mediums of communication between human beings such as the telephone and telegraph. Now this state proposes to regulate the mediums of communication with the spirit world. The maxim is, sic ad astra. Certainly, further than this we cannot go.

Again, is the statute in question merely regulatory or is it prohibitory? Any ex-saloon keeper can explain the difference between regulation and prohibition. Can the state constitutionally prohibit communication with the spirit world, with which, so far as I am advised, we are at peace? If it cannot, can it, under the Fourteenth Amendment, deny the mediums of such communication a reasonable compensation for the services rendered? These queries appear to me to be pertinent in the instant case.

However, assuming that the statute in question is not in contravention of the commerce clause of the federal Constitution, and that the state has power to regulate, I concur, because the medium in question had never filed her schedule of rates with the State Corporation Commission.