## 49408. ELLIS v. THE STATE.

STOLZ, Judge.

The defendant appeals from a three-count conviction for selling prohibited drugs, the dates of the transactions being discrete. Count 2 alleged sale of methadone and oxycodone, and Count 3 sale of oxycodone, as violations of the Uniform Narcotic Drug Act (Code Ann. Ch. 79A). The undisputed testimony was that the tablets sold were oxycodone, the brand name of which is percodan, and methadone; that oxycodone is a synthesis from codeine, an opium alkaloid; that methadone is a synthetic just created basically from an opium alkaloid which does not

have opium as such but is "synthetically produced trying [sic] similar properties of a narcotic without being habit-forming," but has properties similar to other narcotics such as opium derivatives; that it is an addicting drug, but less so than heroin.

1. The pertinent provisions of our Code are as follows: "(12) 'Opium' includes morphine, codeine, and heroin, and any compound, manufacture, salt, derivative, mixture, or preparation of opium, but does not include apomorphine or any of its salts . . . (14) 'Narcotic drugs' means coca leaves, opium, isonipecaine, and every other substance neither chemically nor physically distinguishable from them and any other drugs to which the Federal laws relating to narcotic drugs may now apply; and any drug found by the Georgia State Board of Pharmacy to have an addiction-forming or addiction-sustaining liability similar to morphine or cocaine." Code Ann. § 79A-802 (Ga. L. 1967, pp. 296, 325; 1970, p. 470).

Count 2 charged the defendant with the unlawful sale of oxycodone and methadone. Oxycodone will be discussed subsequently. The state's expert witness testified that methadone was a synthetic created from an opium alkaloid; that it is a synthetic narcotic; and that it is an addictive drug.

At this point, it may be well to review several basic definitions of key words: *Synthesis:* "The art or process of making or 'building up' a compound by the union of simpler compounds or of its elements; as, the *synthesis* of water from hydrogen and oxygen; . . ." *Synthetic:* "Anything manifesting or produced by synthesis; specif., a synthetic substance, material, fabric, or the like; as an organic *synthetic.*" *Alkaloid:* "An organic substance of alkaline properties; an organic base; . . . Among the alkaloids used as drugs are morphine, strychnine, atropine, and cocaine." Also: "Of or pert. to alkaloids; of the nature of an alkaloid." *Alkali:* "Originally, a soluble salt obtained from the ashes of plants, . . ." Webster's New International Dictionary, Second Ed. (Emphasis supplied.)

In the light of the foregoing definitions, it appears that the state's expert witness was simply stating that

methadone was an addictive narcotic produced from opium salts. As such, it clearly comes within the provisions of Code Ann. § 79A-802 (12), which includes by definition "any compound, manufacture, salt, derivative, mixture or preparation of opium." The evidence supported the conviction for selling methadone.

2. Count 3 charged the defendant with the unlawful sale of oxycodone (percodan). The state's expert witness testified that oxycodone is "a synthesis from codeine, which is an opium alkaloid. . .". Reverting to the definitions referred to in Division 1, hereinabove, it becomes clear that the witness was simply saying that the drug in question is made from codeine, which in turn is made from opium salts. As such, it would fall within the definition of opium (codeine) and "any compound, manufacture, salt, derivative, mixture or preparation of opium" found in Code Ann. § 79A-802 (12).

Accordingly, the evidence supports the conviction of unlawfully selling oxycodone, as charged in Counts 2 and 3.

3. The court correctly charged that the state must prove every allegation of the indictment beyond a reasonable doubt and to the satisfaction of the jury before they would be authorized to convict. An additional charge that the defendant and his counsel *contended* he was innocent and, should the jury so find they should acquit, neither added to nor detracted from the original instructions, and does not constitute reversible error.

4. There was undisputed evidence that phentermine, the drug illegal sale of which was charged in Count 1, was sold by the defendant. The witness was asked whether "this is a drug classified under the Dangerous Drug Act of Georgia" and replied in the affirmative. Under Code Ann. § 79A-702, a dangerous drug is one prohibited to be sold without prescription by the Federal Food, Drug and Cosmetic Act, or one so declared and published by the state drug inspector. There was no objection and no question was raised in the trial court that the testimony was a conclusion or was not the highest and best evidence. It was accordingly not error for the judge to instruct the jury that phentermine came within the purview of the Act. *Wilson v. State,* 15 Ga.

App. 632 (5) (84 SE 81).

5. In *Travelers Ins. Co. v. Sheppard,* 85 Ga. 751, 789 (12 SE 18) it was stated: "It surely can be no answer to witnesses who think they are not mistaken upon a question of identity, to show that another witness was mistaken upon a like question in another instance, especially if the evidence of his mistake is chiefly, or even partly, what he has been told by third persons not sworn." In the present case, the defendant contended that he might have been mistaken for a relative who looked much like him. An objection to the question, "Have you of your own knowledge, or do you know anyone that has mistaken Joe Burch for Lewis?" was sustained on the ground that it was irrelevant and immaterial. While the witness might have testified to the resemblance, and to any mistake in identification which he had made or which another had made in his presence, the question as phrased was too broad, and the objection was properly sustained.

*Judgment affirmed. Bell, C. J., Eberhardt, P. J., Pannell, P. J., Evans, Clark and Webb, JJ., concur. Deen and Quillian, JJ., dissent.*

ARGUED MAY 29, 1974 — DECIDED SEPTEMBER 24, 1974.

*Joe Salem,* for appellant.

*Lewis R. Slaton, District Attorney, Carter Goode, J. Melvin England, Morris H. Rosenberg, Assistant District Attorneys,* for appellee.

DEEN, Judge, dissenting.

I must dissent from the affirmance of the conviction as to Counts 2 and 3 of the indictment, and Divisions 1 and 2 of the opinion.

The state has the initial burden of proving that the drugs, the sale of which is charged in the indictment, are narcotics. This may be done in a number of ways, including a showing that the drug has been so classified under the Federal laws, or that it has been classified by the Georgia State Board of Pharmacy as addictive. These

two classifications are exceedingly broad and doubtless include almost every drug known to medical science to be what we call a narcotic in common parlance. Neither of these methods of proof was used as to oxycodone or methadone. The third method of proof is to offer testimony that it comes from opium (that is, that it is a compound, manufacture, salt, derivative, mixture or preparation made from opium), opium being a substance obtained from a certain variety of poppy. As I read the evidence, the state failed in this endeavor.

Let us take first the methadone. Does methadone "come from" opium; that is, is any chemical constituent of methadone derived in the first instance from the poppy plant? We know as a matter of fact that it is not. The expert testified that it is a "synthetic." One of the dictionary definitions of *synthetic* not quoted in the majority opinion, but applicable here, is "produced from artificial processes." We know as a matter of fact that methadone is synthetically (artificially) produced in the laboratory and does not come from opium. Regardless of the closeness of the chemical formulae of these substances, it simply cannot be said that methadone comes under either Code Ann. § 79A-802 (12) or (14). Furthermore, the so-called expert whose testimony was that methadone is *"synthetically produced* trying *similar* properties of a narcotic without being habit-forming" by this testimony admitted the drug was not an opium derivative and contradicted his own testimony, for how can any substance whatever be *addictive* if it is not *habit-forming?*

Drugs are dangerous, and we have a natural bias toward ridding our state of the evils engendered by drug peddling. But this result can only be accomplished by offering the readily available proof of narcotic content at the trial level; not by countenancing the use of evidence which fails of its purpose.

In regard to the oxycodone, we have the same problem. It is not shown to be a drug classified as a narcotic under either Federal or State law, so it has to come under Code Ann. § 79A-802 (14) to be a narcotic drug by definition. That is, it must be one of certain substances, including opium, or a substance "neither chemically nor physically distinguishable from" opium.

There is no testimony at all that the drug meets these qualifications. Instead, there is testimony that it is "a synthesis" from the opiate codeine. There is no way of knowing whether this makes it a narcotic or not, and there is no testimony that it is in fact a narcotic. We are cited to the California case of Rivas v. United States, 368 F2d 703, where it appears that prior to 1965 the drug could be sold without a narcotics prescription but that it now requires one. We are also aware that the new Georgia Controlled Substances Act, Ga. L. 1974, pp. 221, 225 includes within the definition of "manufacture" the conversion of a controlled substance "independently by means of chemical synthesis," but the law in effect at the time of this offense did not do so. The classification is important because of the fact that some drugs are far more addictive than others, for which reason the Narcotics Act, the Dangerous Drugs Act, the Drug Abuse Control Law, and now the Controlled Substances Act make distinctions between drugs and the penal consequences of selling them which laymen cannot make. For this reason I feel that the threshold evidence necessary for conviction should be demanded by the courts and procured by the prosecutors, in the interest of consistency of drug enforcement.

I am authorized to state that Judge Quillian concurs in this dissent.