George L. WHITEHORN, Jr., Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–476.

Court of Criminal Appeals of Oklahoma.

Feb. 23, 1977.

James H. Gungoll, Enid, Bishop & Wantland, Seminole, for appellant.

Larry Derryberry, Atty. Gen., Frank Muret, Asst. Atty. Gen., for appellee.

Leo H. Whinery, Norman, for Kiowa and Otoe Chapters of the Native American Church of Okl., amicus curiae.

## OPINION

BLISS, Judge:

The Appellant, George L. Whitehorn, Jr., hereinafter referred to as defendant, was charged in the District Court of Garfield County, Case No. CRF–75–18, with the offense of Possession of a Controlled Dangerous Substance, Peyote, in violation of the Uniform Controlled Dangerous Substances Act of the State of Oklahoma. Jury trial was waived and the State and the defense adopted the facts adduced at the preliminary hearing and the State submitted testimony of two (2) more witnesses. The defendant was found guilty by the trial court and sentenced to a term of two (2) years under the custody and control of the Department of Corrections of the state of Oklahoma, said sentence being suspended. From said judgment and sentence the defendant has perfected his timely appeal.

The transcript of the preliminary hearing reveals that the State first called the Oklahoma Highway Patrol Trooper Kenneth Clark, who testified that on January 5, 1975, he had occasion to observe the defendant driving a vehicle in Enid and noticed that the vehicle was in violation of several vehicle inspection laws. The defendant was subsequently stopped and charged with operating a defective vehicle, operating a motor vehicle with expired safety inspection sticker and driving while his driver's license was under suspension. The vehicle was then impounded and the defendant booked into jail where his personal possessions were surrendered and inventoried. At that time it was discovered that the defendant was wearing a string of peyote buttons around his neck and had other peyote buttons wrapped and tied in a handkerchief inside his pocket. The defendant admitted to the officer that the substance was peyote. It was then stipulated that the items con-

tained in State's Exhibit No. 1 were the items taken from the defendant and the officer testified that Exhibit No. 1 and its contents were mailed to the Oklahoma State Bureau of Investigation. It was further stipulated by the defense that the material seized was peyote.

Trooper Gary Pierce, Clark's companion on the date in question, then testified that when the contents of State's Exhibit No. 1 were taken from the defendant he recognized the buttons as being peyote.

Dennis Goodpasture, forensic chemist for the O.S.B.I. then testified that Exhibit No. 1 contained 18 peyote buttons and the defense stipulated that, "Mescaline would be in peyote and that it can be derived from it, but it's two different substances." Goodpasture then related that he was of the opinion that the material analyzed contained mescaline and that the material appeared to be peyote buttons. On cross-examination he testified that mescaline can be derived from peyote, but peyote is a natural substance grown on a cactus plant.

The State then rested.

The first witness for the defense was the defendant, who testified that he was a resident of Redrock, Oklahoma, was a member of the Otoe Tribe and the Ponca Tribe and was a member of the Native American Church. Defendant admitted that the contents of Exhibit No. 1 was peyote and that he had peyote in his possession at the time of his arrest. Defendant further stated that he first attended the Native American Church when he was about 8 or 9 years old when he went to a peyote meeting with his father and that when he was arrested he was driving to visit his father to learn some peyote songs. He further stated that the peyote in his possession originally came from his uncle, Harrison Whitehorn,[1] and upon his death it passed to the defendant. He explained that peyote was used as a sacrament in the religious ceremonies of the Native American Church, that it was precious to the members, that it was not used for illicit drug purposes. He further related that he usually did not carry the buttons on his person but had been cleaning his room and put them in his overcoat pocket and then forgot to leave them in his room. He further stated that he did not have peyote on a string around his neck but that it was wrapped in the handkerchief.

On cross-examination the defendant stated that he had participated in peyote ceremonies since he was eight and had attended approximately 30 ceremonies at a rate of at least one a year. He further stated that he considered himself a member of both the Ponca and Otoe Chapters of the Church, because he was an Indian and had chosen that particular Church, although he had no membership card and was not reflected on the rolls of either chapter.

The defense then called Fred B. Hoffman, a past president and secretary of the Native American Church of Oklahoma. He testified that peyote was a part of the Church's religious worship and was used as a sacrament. Hoffman further testified that a member might carry peyote on his person as a religious symbol. He stated that, when the defendant became a member of the Church, membership cards were not issued, that the habits of worship varied with individuals, some being more regular and active than others, and that the only requirement for membership was one-quarter (¼) Indian blood and participation in Church activities. He was not personally acquainted with the defendant.

1. A "Harrison Whitehorn" of Redrock, Oklahoma, is listed as one of the trustees of The Church of the First Born in the Articles of Incorporation filed with the Oklahoma Secretary of State, March 18, 1920. According to one anthropological source The Church of the Newborn is an early branch of the Native American Church. Weston LaBarre. *The Peyote Cult*, Hamden: The Shoe String Press, Inc. (1959).

Truman Dailey then testified that he was a member of the Native American Church, that he knew the defendant to be a member and had attended church meetings with him, the last meeting being approximately two (2) years ago. On cross-examination the witness stated that there were no required membership cards or rolls to identify members of the Otoe Chapter but cards were issued to persons for identification purposes so they could travel to Texas to purchase peyote and bring it back.

Reverend Barney Jackson then testified that he was an Episcopal Priest and described the Christian uses of bread and wine as a sacrament. In response to a question concerning whether the sacrament had ever been carried about on the persons of laymen, Reverend Jackson stated as follows:

"Yes, it has, specifically in the early Church, with irregular practices through our history from time to time, carried by laymen for communion to their fellow laymen and also, in some exceptions, for veneration purposes."

Lee Black then testified that he had known the defendant his entire life, that he was a member of the Native American Church and knew the defendant to be a member. He further stated the peyote was used in religious ceremonies as a sacrament, that it was used for the sick and that it was carried as a religious object or symbol of veneration. He stated as follows:

"I might add that when Mr. Whitehorn was testifying a while ago pertaining to some of the songs that he wanted to learn, there are very few of us Otoes that knows some of the songs that his father knows, I myself. I intend to go see George Whitehorn, Sr. to get some of those songs I could use in the Church because I have carried my Peyote for, oh, gosh, 50 years, and my father had that longer than that and it was handed down to me and I still have it. We are all derivities of the Native American Church.

All Indians are derived from the Native American Church. That's where the Christianity started was the Native American Church and it dwelled out into other Churches." (Preliminary Hearing Tr. 52)

The witness stated that it was a custom to pass peyote buttons down in the family and that the Native American Church conducts a form of Christian worship.

Viola Hatch then testified that although she was not a member of the Church she was familiar with the reasons for an attempt to list church members, the reason being to obtain approximate numbers from each chapter for funding purposes in order to facilitate the purchase of materials and peyote. The defense then rested.

In rebuttal the State called Calvin Williams, a member of the Caddo Chapter of the Church who testified that he was on the present State of Oklahoma Board of Trustees of said Church and was treasurer of the Caddo Chapter which had been associated with the State of Oklahoma for approximately five (5) years. He further testified the Caddo Chapter maintained a roster list of all members and that in order to join the Church a prospective member is required to attend business meetings until members decide whether he is to be accepted into the chapter. In the Caddo Chapter one does not automatically become a member by being Indian and attending a service. On cross-examination he admitted that there were other chapters in the Church that did not keep membership rosters and that he could not testify that the defendant was not a member of the Church.

The State then called Joe Bassett who testified that he was a resident of Redrock, had been a member of the Otoe Chapter for 33 to 34 years and had known the defendant for several years but did not know if he was a member of that chapter. He further stated that he had never seen the defendant

at any religious ceremony of the Otoe Chapter. On cross-examination the witness stated that he had not attended every religious ceremony. He further stated that he had been chairman of the Otoe Chapter two (2) years ago and that there was a membership roster which did not include the defendant. The roster listed those members which were "real active" in the Church but did not list all members.

For the defense Fred Hoffman reiterated that there was no rule that an individual must be on a roll to be a member of the Church and Dana A. Knight, a Ponca Tribe member stated that the Ponca Chapter kept no list of members.

At the trial, after admission of the foregoing preliminary hearing evidence, Margaret Coffey Downs testified she was the treasurer of the State organization of the Church and as such had in her possession certain records of the Church including a roster of the Otoe Chapter and a roster of the Ponca Chapter and a Resolution of the State organization requiring membership rolls. On cross-examination she admitted that the Resolution and the rolls were for the purpose of registering with the pharmacy board in Texas. She further stated that the Resolution did not require every member of the Church to have a membership card and that the rosters were lists of those who had membership cards. The State then called Larry Butler, Sr., who testified that he was a member of the Church and was currently State Chairman. His testimony consisted of a description of his concept of the peyote ritual of the Church.

■ The defendant's first assignment of error urges that possession of peyote is not a crime in the State of Oklahoma for the reason that peyote is not specifically listed in Schedule I of 63 O.S.1971, § 2–204 of the Uniform Controlled Dangerous Substances Act. In support of his contention defendant urges that a comparison of the Federal Controlled Dangerous Substances Act, 21 U.S.C., § 812 with § 2–204 of the Oklahoma Act reveals that the Federal Act specifically listed peyote in Schedule I whereas the Oklahoma Act deletes peyote from the list.

However, 63 O.S.1971, § 2–204 in its pertinent parts reads as follows, to wit:

"The controlled dangerous substances listed in this section are included in Schedule I.

* * * * * *

C. *Any material, compound, mixture or preparation which contains* any quantity of the following hallucinogenic substances, their salts, isomers and salts of isomers, unless specifically excepted, whenever the existence of these salts, isomers, and salts of isomers is possible within the specific chemical designation:

* * * * * *

11. Mescaline." (Emphasis added.)

Forensic chemist Dennis Goodpasture testified during the preliminary hearing, in response to questions by the defense, that peyote is a natural substance grown on a cactus plant from which mescaline can be derived. He further stated as follows:

"Q. It would be possible though, I presume, to extract Mescaline from Peyote?

"A. Yes sir.

"Q. What would this involve?

"A. Just placing the portion of the peyote button in a bottle and allowing it to soak with some organic solvent and then the Mescaline will soak out.

"Q. And then you can separate the Mescaline from the solvent?

"A. Yes sir." (Preliminary Hearing Tr. 25)

The record of the preliminary hearing further reveals that the defense stipulated as follows, to-wit:

"Reserving the right to cross-examine, we will stipulate that Mescaline would be in Peyote and that it can be derived from it, but it's two different substances." (Preliminary Hearing Tr. 22)

In light of the foregoing it is apparent that peyote is a material which contains a quantity of mescaline and therefore its possession is prohibited by the Oklahoma Act. See, *Ellis v. State,* 132 Ga.App. 684, 209

S.E.2d 106; and *State v. Riggins,* 11 Wash. App. 449, 523 P.2d 452.

█ The defendant next urges that the State failed to demonstrate that the quantity of peyote found on the defendant's person was sufficient to cause hallucinogenic effects. In support of his argument the defendant contends that a majority of the States now hold that the burden is upon the prosecution to demonstrate that the quantity of the drug possessed was sufficient to cause such hallucinogenic effects, in other words, the State must prove possession of a useable quantity. See, *State v. Moreno,* 92 Ariz. 116, 374 P.2d 872.

However, this Court has addressed itself to this question in *Doyle v. State,* Okl.Cr., 511 P.2d 1133 (1973), wherein we held, in an analogous situation concerning a substance listed in 63 O.S.1972 Supp., § 2–206 D(1), as follows:

> "Clearly by the statutory language stating 'which contains any quantity of the following substances' the legislature classified amphetamine as a controlled dangerous substance in any quantity."

Therefore, in the instant case, as in *Doyle,* § 2–204 C does not require the State to prove that the quantity of the substance possessed by an accused was sufficient to cause hallucinogenic effects. The defendant's second assignment of error is without merit.

The defendant further urges that even if possession of peyote is considered a criminal offense the defendant is protected by the First Amendment of the United States Constitution, right to religious freedom, and is granted an exception to the possession law. As this is a case of first impression in Oklahoma, it is necessary to examine the decisions of other jurisdictions.

█ It is a well settled principle of the law that the First Amendment, right to freedom of religion, grants an individual the right to the free exercise of the prac-

tices of his chosen religion without governmental intervention or interferences unless a contravening compelling State interest in regulation is shown.[2] *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

In *State v. Whittingham,* 19 Ariz.App. 27, 504 P.2d 950 (1973), the Arizona Court considered the state interest in regulation of peyote possession versus the right of members of the Native American Church to practice peyotism and held that peyotism as practiced by the Native American Church is an established religion with a long and continuous history[3] and is not a fad or a part of the popular drug culture. The record before us reveals the same. The Arizona Court further points out that the federal government has recognized that peyotism is a legitimate religious practice and has made an exception for the use of peyote in religious ceremonies on reservations and that other jurisdictions have by statute or judicial decree recognized the same exception to their possession laws. Therefore, the Arizona Court, citing *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964), held that the First Amendment, right of freedom of religion, clothes members of the Native American Church with immunity from prosecution.

█ In the instant case the State did not present evidence which would sustain a finding of a state interest in regulation compelling enough to prohibit the exercise of the religious practice of peyotism by the Native American Church and its members. From the record before us it is apparent that the Native American Church is recognized by the State of Oklahoma and has a statewide organization of local chapters. It is, therefore, our opinion that in a prosecution for possession of peyote under the provisions of the Uniform Controlled Dangerous Substances Act it is a defense to show that the peyote was being used in connec-

---

**2.** For a case in which a compelling state interest was shown see, *Lewellyn v. State,* Okl.Cr., 489 P.2d 511 (1971).

**3.** For a lengthy discussion on the history of peyotism see, *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813, 817, 818 (1964).

tion with a bona fide practice of the Native American Church and that it was used or possessed in a manner not dangerous to the public health, safety or morals.

This gives rise to two questions: Who is a member of the Native American Church? Or, more accurately, how is that determination made? And what constitutes a "connection with a bona fide practice"?

 The former is perhaps the more difficult; as pointed out in the brief for rehearing by the Amicus Curiae, neither this Court or to our knowledge, any court under the United States Constitution has ever required a Church to enroll all its membership in order to enjoy freedom of religious practice as guaranteed by the First Amendment. However, even though we have ruled today that the State does not have an interest compelling enough to prohibit the practice of peyotism by the Native American Church, the State, nevertheless, does have an interest in the overall enforcement of its controlled substances law. Therefore, while it might be unreasonable to require total enrollment of all church members, we do not believe it unreasonable to require the partial enrollment [4] of those church members who wish to purchase, possess, or transport peyote in connection with a bona fide practice of the Native American

Church as exception to the State Uniform Controlled Dangerous Substances Act. Inherent in our discussion here is the recognition that it is the non-ceremonial uses of peyote, not the ceremonial use that pose the greater problem to enforcement and regulation by the State. In any case, in the absence of legislation,[5] particularly exempting the Native American Church and setting up specific rules to administer such exemption, we must lay down a procedure to be used by law enforcement agencies and the courts to determine ". . . whether the claimant holds his belief honestly and in good faith or whether he seeks to wear the mantle of religious immunity merely as a cloak for illegal activities." *People v. Woody,* supra, page 77, 394 P.2d page 821.

Inasmuch as we have found the Native American Church is recognized by Oklahoma as an established religion the burden laid down in *Woody,* supra, translates in the application here to whether the claimant is a member of the Native American Church or merely claims membership as a cloak for illegal possession or use of peyote. Such a burden by way of affirmative defense is not foreclosed by the First Amendment:

> "[T]he trier of fact need inquire only into the question of whether the defendant's belief in Peyotism [Native American Church] is honest and in good faith. As

---

**4.** See for instance Title 71, Texas Statute, Article 4476–15 subsection (4.11), to-wit:

> "The provisions of this Act relating to the possession and distribution of peyote shall not apply to the use of peyote by members of the Native American Church in bona fide religious ceremonies of the church. However, persons who supply the substance to the church are required to register and maintain appropriate records of receipts and disbursements in accordance with the rules promulgated by the director. . . ."

Under Section 1.02, (9) of the same Article "Director" is defined as "Director of the Texas Department of Public Safety", who by virtue of such authority has promulgated rules for purchase of peyote requiring the purchaser to either be a member of the Native American Church in good standing with specific proof thereof, or have and present a "certificate of authorization" containing specific information. See, *Texas Controlled Substances Act, Rules Adopted by the Texas Department of Public Safety,* Section 201.07.11.001–004. Such legis-

lation directly requires partial enrollment of those members who wish to purchase peyote.

**5.** The Oklahoma Legislature has extended limited rule making authority to the Commissioner of Narcotics and Dangerous Drugs Control to exempt certain groups from prosecution for possession, distribution, or use of dangerous substances; these named groups are "persons engaged in research on scientific activities . . . persons engaged in a program of drug education or persons in the performance of an official duty." Title 63, Oklahoma Statutes, 1971, Section 2–106(H); from a literal reading of this statute it can be seen that it is neither broad enough to nor specifically confers authority to exempt religious organizations from prosecution although the Commissioner of Narcotics and Dangerous Drugs, rule 900.07 purports to exempt the Native American Church members from prosecution. Moreover, even if such exemption were effective there is no procedure set out to administer the exemption.

the court in *United States v. Ballard* (1944) 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148, held although judicial examination of the truth or validity of religious beliefs is foreclosed by the First Amendment, the courts of necessity must ask whether the claimant holds his belief honestly and in good faith or whether he seeks to wear the mantle of religious immunity merely as a cloak for illegal activities. . . .

"We do not doubt the capacity of judge and jury to distinguish between those who would feign faith in an esoteric religion and those who would honestly follow it. 'Suffice it to say that trial courts will have to determine in each instance, with whatever evidence is at hand, whether or not the assertion of a belief which is protected by the First Amendment is in fact a spurious claim.' (*In re Jenison,* supra, Minn., 125 N.W.2d 588, 590) Thus the court makes a factual examination of the bona fides of the belief and does not intrude into the religious issue at all; it does not determine the nature of the belief but the nature of defendants' adherence to it." *People v. Woody,* supra, page 76, 394 P.2d page 821, see, also *In re Grady,* 61 Cal.2d 887, 39 Cal.Rptr. 912, 394 P.2d 728 (1964).

We wish to make it abundantly clear that we do not hold today that all members of the Native American Church must be enrolled or carry certificates of membership; we do hold that unless or until such time the legislature acts to exempt and provide for the administration of such exemption, the question of membership in the Native American Church is for the trier of fact.

We now must consider whether or not the defendant in the case at bar was a member of the Native American Church. The trial court, sitting as the trier of fact in this case stated that he was not convinced the defendant is a member of the Church; however he conceded arguendo that he was a member. (Sentencing hearing page 4); It must be recognized that the trial court was acting in an area of first impression in State criminal law. In any case, it is our opinion and we so hold that the defendant is a member of the Native American Church. The defendant testified that he is a member of the Church, having attended his first meeting with his father when he was 8 or 9 years old. (Preliminary Hearing Tr. 32) Although, he has been attending most regularly since he was 26 (Preliminary Hearing Tr. 31). He further stated that he had attended about 30 ceremonies (Preliminary Hearing Tr. 32), and is a member of both the Ponca and Otoe Chapters; he stated that he was a member because he was an Indian and had chosen the Church although he was not on the membership rolls. (Preliminary Hearing Tr. 33, 34). Other witnesses testified corroborating the defendant's membership, and two witnesses for the State testified generally, concerning requirements for membership, but each stated they could not say the defendant was not a member. 76 Am.Jur.2d, Trial § 1239, page 192 states:

"On a trial without a jury, the court is entitled to consider all the evidence and to draw therefrom such inferences as are reasonable and proper under the circumstances, even though another inference equally reasonable might also be drawn therefrom. The weight of inferences and of the explanation offered to meet them is for the determination of the court when it is the trier of the facts. The question of the credibility of witnesses is addressed to the court sitting as a jury, who is not required to accept the testimony of a witness deemed unreliable, although it may be uncontradicted.

"However, a judge may not arbitrarily ignore positive evidence which is not incredible and which is uncontradicted." [Footnote references omitted].

See, also, *Sarg v. Sugg,* 186 Okl. 37, 96 P.2d 15 (1939). This Court will not normally overrule a decision of fact made by a trial judge sitting as trier of fact; however, again recognizing this is a case of first impression we feel there was much positive evidence demonstrating defendant's membership in the Native American Church that is not incredible and which is uncontradicted.

We now address the second question raised above: What constitutes a connection with a bona fide practice of the Native American Church? At first blush this question appears also to be for the trier of fact, but it is not. It is a matter of law for the courts to decide.

We first point out that the use or possession of peyote is itself an issue of fact which must be proven beyond a reasonable doubt to the jury in the State's case in chief; however, the legal question is: Taking these facts as true, or stated differently, if believed by the jury, would such facts prove an act of possession or use which act the State may not prohibit as a bona fide religious practice guaranteed by the First Amendment to the United States Constitution. If so, then the trial court must instruct that the act is protected if the jury finds the defendant is a Church member.

 In the instant case, the act sought by the defendant to be protected by the First Amendment is the simple possession of peyote. We have held today that the Native American Church is a recognized religion and that the defendant is a member of that Church; we now hold that under the facts of the instant case, possession of peyote by the defendant was and is protected. The defendant testified that when he was arrested he was on his way to visit his Father, who was in a care home, to learn some peyote songs that his Father knew (Preliminary Hearing Tr. 29). He further testified that he had obtained the peyote that was found in his possession from his uncle, Harrison Whitehorn, at the time the latter had died. (Preliminary Hearing Tr. 29). This practice of, "inheriting" these sacred buttons was corroborated by Lee Black (Preliminary Hearing Tr. 52), formerly a member of the Board of Trustees of the Native American Church. The practice of, "carrying" peyote by members of the Native American Church was brought out on direct examination of Mr. Fred Hoffman, a Native American Church member, wherein he stated:

"Q. Is Peyote ever carried by members of the Church?

"A. Yes, we have a little box where we keep, just like they do in a Church, a piano and instruments. We have feathers and we carry our Peyote right in a box with us.

"Q. And a person might carry Peyote on their person as a religious symbol or object?

"A. We do, we even go into other States and carry this Peyote right with us." (Tr. 38, 39).

Mr. Dana Knight corroborated Mr. Hoffman's testimony relating to this specific use of peyote. He testified that, "carrying this peyote is something that is very holy and religious to our people. Many of our war veterans have taken it across and they brought it back and they use it because they believe that this thing was given to them by God . . ." (Preliminary Hearing Tr. 74). This use of peyote by the Native American Church members is an intricate part of their constitutionally protected religious beliefs and therefore should be protected from governmental interference.

As noted earlier it is the non-ceremonial use of peyote that poses the greater problem to law enforcement, such as the simple possession of peyote in the case at bar; however, in *Sherbert v. Verner,* supra, at 1795, the Supreme Court very clearly stated that: " 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation' ". of the First Amendment right to freedom of religious practice; accordingly, we are of the opinion that there has been no state interest shown compelling enough to prevent the Native American Church members from possessing their sacred, sometimes "inherited", peyote and from transporting the same on their person within the State of Oklahoma.

In our decision today we have affirmed that the legislature cannot enact laws that have the effect of substantially infringing upon the First Amendment right to establish a religion and freely practice the same; we have declined to legislate specific guidelines that would bring into balance the le-

**548**

gitimate aims of the State in regulation and law enforcement, and the sacred interest of the Native American Church; we have instead, judicially applied the First Amendment and placed the issue of the defendant's membership in the Native American Church before the trier of fact to protect the Church and the interest of the State from those who would use peyote for non-religious purposes committing sacrilege against the Church and in violation of the drug laws of the State. It is clear that under our ruling today that membership is ultimately an issue of evidence before the trier of fact; accordingly, the best evidence of such membership would be registration with the Church on a voluntary basis much the same as most churches across the land, especially the registration of those who wish to possess peyote outside the ceremonial veil. Such, however, is not a requirement; the desirability of establishing membership rolls and using membership cards for the protection of the bona fide members of the Native American Church in possessing and using peyote in its religious ritual and to prevent non-believers from committing sacrilege against the church is a matter for the ultimate determination of the Board of Trustees of the Native American Church and the members thereof.

For the foregoing reasons the judgment and sentence appealed from is *REVERSED AND REMANDED TO THE TRIAL COURT WITH DIRECTIONS TO DISMISS.*

BUSSEY, P. J., and BRETT, J., concur.