John Bennett LEWELLYN, a/k/a Jean L'Aquarius, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–77–579.

Court of Criminal Appeals of Oklahoma.

March 20, 1979.
Rehearing Denied April 27, 1979.

An Appeal from the District Court, Mayes County; William J. Whistler, Judge.

John Bennett Lewellyn, a/k/a Jean L'Aquarius, pro se.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., Carol Elaine Alexander, Legal Intern, for appellee.

## OPINION

CORNISH, Presiding Judge:

This is an appeal by John Bennett Lewellyn, appellant, a/k/a Jean L'Aquarius, "a priest in the Holy American Church." Appellant asserts on appeal that the State of Oklahoma does not have proper jurisdiction in this case. His contentions on appeal are that: (1) the Magna Carta is incorporated into the First Amendment of the United States Constitution; (2) the sovereign head of the Holy American Church is answerable only to an ecclesiastical court; and (3) the marihuana laws of the State of Oklahoma are unconstitutional because they do not provide for the use of the drug as a religious sacrament.

Appellant was charged by information pursuant to 63 O.S.Supp.1975, § 2–401, ¶ B 2.[1] He waived jury trial and represented himself pro se, although he was also represented by standby counsel. The trial court found appellant guilty of Unlawful Delivery of Marihuana, After Former Conviction of a Felony, pursuant to 21 O.S.Supp.1976, § 51, and punishment was assessed at ten (10) years' imprisonment.

The evidence at the trial reflected the following facts: On the 26th day of September, 1976, Dennis Dill, an undercover narcotics agent of the Mayes County District Attorney's Office, accompanied by a contact, went to a house rented by Chuck Newman. At the house, Agent Dill explained to Newman that he wished to purchase some marihuana. Present in the house were Newman, Lewellyn and four or five other persons whose identities are not relevant to this appeal. The actual sale took place in the kitchen of the residence in the presence of Newman, Agent Dill and the appellant. There was some conversation concerning the amount of marihuana Agent Dill sought to purchase. At that time, the appellant stated, "yes, we can sell a half pound." Agent Dill testified that after an agreement was reached on the amount to be sold, Newman and Lewellyn went to the refrigerator and took out two large bags of a green leafy substance. Newman then took some measuring scales from a cabinet and he and Lewellyn began to measure out eight ounces of marihuana. Each had a bag of marihuana, and they alternately placed handfuls of the substance onto the scales until the proper measurement had been reached. Agent Dill testified he paid Newman $60.00; then he and his contact left the residence with the marihuana.

On December 3, 1976, the Mayes County District Attorney's Office conducted a large-scale drug raid using the information obtained by Agent Dill. Appellant was arrested for the unlawful delivery of marihuana which occurred on September 26, 1976.

### I

The primary thrust of appellant's argument is based on the legal defense of religious freedom. Religious freedom is protected by the First Amendment to the Con-

1. See note 7, infra.

stitution of the United States.[2] The State of Oklahoma is precluded from abridging religious liberties by the Due Process Clause of the Fourteenth Amendment and the Constitution of Oklahoma, Art. I, § 2.[3]

Religious liberty is not an unlimited freedom, and while laws cannot interfere with mere religious belief and opinions, they may inhibit certain acts or practices. Perfect toleration of religious sentiment does not include the right to introduce and carry out every scheme or purpose which persons see fit. The religious liberty intended by the framers of the Constitution is not a license unrestrained by law. One cannot stretch this liberty so as to interfere with that of his neighbor or violate police regulations or the penal laws of the land, enacted for the good order and general welfare of all the people.[4]

The appellant's purported legal defense of religious freedom has failed in analogous areas.[5] The religious practice of polygamy by Mormons provided the opportunity in 1878, for the United States Supreme Court's first articulation of the meaning of religious freedom and the extent to which Congress could enact laws relative to the establishment of religion. In *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), the Supreme Court drew a distinction between religious beliefs and religious acts by formulating the "secular regulation" rule. The Court held the First Amendment does not confer constitutional protection on religious practices that contravene generally acceptable legislation. Protection was bestowed only on religious beliefs and opinions. This distinction di-

minished much of the thrust of free exercise because religious beliefs are not normally questioned until they are manifested in some act. The Court in *Reynolds* said, "To permit this [bigamy] would be to make the professed doctrine of religious belief superior to the law of the land, and in effect permit every citizen to become a law unto himself. . . . " Because antipolygamy laws were constitutional as generally applied, the religious practice of polygamy was compelled to yield to the enforcement of the statute.

The initial erosion of the secular regulation rule occurred in *Cantwell v. Connecticut*, 310 U.S. 296, 303, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218 (1940), a case involving the closely interrelated questions of freedom of religion and freedom of speech. The Court said:

" . . . Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. . . . In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. . . . "

Contrasted to the secular regulation rule, the decision implied that some religious practices are not subject to general applicable legislation.

Three years later, in a case involving integral questions of speech and religion, the Court used nonspecific language to indicate when religious acts would be exempt from legislation. In *West Virginia State*

---

2. The First Amendment to the Constitution of the United States provides:

   "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . "

3. It is provided by the Oklahoma Constitution, Art. I, § 2, in pertinent part:

   "Perfect toleration of religious sentiment shall be secured, and no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship; . . . "

4. *McMasters v. State*, 21 Okl.Cr. 318, 207 P. 566 (1922), 29 A.L.R. 292 (1924).

5. State laws particularly proscribe the use of snakes in religious activities. See *Lawson v. Commonwealth*, 291 Ky. 437, 164 S.W.2d 972 (1942). Fortune telling defended on religious ground was prosecuted in *State v. Neitzel*, 69 Wash. 567, 125 P. 939 (1912). Two other groups of related cases, those compelling parents to act against their religious beliefs for the presumed benefit of their children and those facing medical treatment contrary to their religious convictions are illustrative of the borderlines of the religious defense.

*Bd. of Edu. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the Court determined that a school regulation requiring mandatory flag saluting was unconstitutional in its application to children whose religious beliefs forbade saluting "graven images." The Court held that freedom of speech, press, assembly, and worship "are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect."

The following year, *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), was decided strictly on the issue of religious freedom. A balancing test was utilized, and the Court held a woman subject to prosecution for permitting her nine-year-old niece to sell religious literature on a street corner in violation of the child labor laws. The determinate factor was the Court's premise that the debilitative practice of child labor was appropriate for legislative action because society's interest in child welfare controlled over the religious activities of children. For the next sixteen years, the Supreme Court refused to consider questions involving the freedom of religion.

The Supreme Court again considered the question of religious freedom in *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). It applied the "alternative means" test and held that Sunday closing laws were applicable to Orthodox Jewish businessmen who also closed on Saturday because of their religious tenets without violating their free exercise of religion. Although the burden was caused by adherence to a religious practice, the Court determined that the burden was basically economic and emphasized the indirectness of the impediment on the free exercise of religion.

In *Sherbert v. Verner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965, 972 (1963), the Court held that a state cannot deny unemployment compensation to persons whose religious motivations render them unavailable for Sunday employment. In reaching its decision a new component was presented in the continuing development of guidelines concerning the exercise of freedom of religion. The Court said:

"We must next consider whether some compelling state interest enforced in the eligibility provisions of the South Carolina statute justifies the substantial infringement of appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation,' . . . "

The Court in *Sherbert* applied a two-stage test: The burden placed on the religion; and whether there is a compelling state interest which justifies not permitting a religious exemption. This second consideration requires a determination of the effect of the religious freedom on the purpose of the statute.

*People v. Woody,* 61 Cal.2d 716, 40 Cal. Rptr. 69, 394 P.2d 813 (1964), represents the outermost extension of the *Sherbert* test. The California Supreme Court utilizing the compelling interest, alternative means, and balancing test, held that members of the Native American Church who used peyote as a sacrament in their worship were exempt from statutes prohibiting use or possession of peyote. The importance of the particular practice to the religion was balanced against the importance of the state interests and against the impact of a religious exemption on that interest. Because peyote represented the centrum of the Indian's religious experience, great importance was placed on religious freedom. For the first time, a court determined the burden by examining whether a practice was "central" to the religion. It found that the state had no compelling interest in preventing the Indians from using peyote in their religion, because the use of peyote represented only slight danger to the state in its law enforcement. *Braunfeld v. Brown, supra,* requires a state to show that there is no alternative means to accomplishing the same legislative ends without infringing on religious freedom. The Court in *People v.*

*Woody, supra,* held that the state had failed to meet this burden.[6]

The defensive theory of freedom of religion was rejected in *Leary v. United States,* 383 F.2d 851 (5th Cir. 1967); *rehearing denied* 392 F.2d 220 (1968); *rev'd on other grounds,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). The Court concluded a compelling interest justified refusing a religious exemption. It held that the use of peyote in the limited bona fide religious ceremonies of the Native American Church was readily distinguishable from the private and personal use of marihuana by a person claiming the utilization as a religious practice.

■ In the recent case of *Whitehorn v. State,* Okl.Cr., 561 P.2d 539 (1977), this Court held that 63 O.S.1971, § 2–401,[7] does not prohibit possession of peyote by bona fide members of the Native American Church, if such a member holds an honest religious belief and is not claiming the protection of the First Amendment merely as a cloak for illegal activities. In *Whitehorn* we recognized a well established principle of the First Amendment that an individual has a right to free exercise of his chosen religion without governmental intervention unless a contravening compelling state interest in regulation is shown to exist. The holding in *Whitehorn* was based on the finding that there was insufficient evidence presented to sustain a finding of compelling state interest in prohibiting the possession and use of peyote by members of the Native American Church.

■ The present case is clearly distinguishable from *Whitehorn.* Here, the appellant was convicted for distribution of a controlled dangerous substance, not mere possession. Significantly, the person receiving the marihuana was not a member of the professed religion. Without addressing

6. See J. Phillips' Free Exercise: Religion goes to "Pot," 56 Cal.L.Rev. 100 (1968); and J. Weiss and S. Wizner, "Pot, Prayer, Politics and Privacy: The Right To Cut Your Own Throat in Your Own Way," 54 Iowa L.Rev. 709 (1969), for further discussion.

7. Title 63 O.S.1971, § 2–401, was amended by Laws 1975 to provide as follows:

"A. Except as authorized by this act, it shall be unlawful for any person:

"1. To manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled dangerous substance;

"2. To create, distribute, or possess with intent to distribute, a counterfeit controlled dangerous substance.

"B. Any person who violates this section with respect to:

"1. A substance classified in Schedules I or II which is a narcotic drug or lysergic acid diethylamide (LSD) is guilty of a felony and shall be sentenced to a term of imprisonment for not less than five (5) years nor more than twenty (20) years and a fine of not more than Twenty Thousand Dollars ($20,000.00). Such sentence shall not be subject to statutory provisions for suspended sentences, deferred sentences or probation except where the conviction is for a first offense. The provisions of this paragraph shall be applicable to all cases under this paragraph whether or not judgment and sentence on the effective date of this act have become final.

"2. Any other controlled dangerous substance classified in Schedule I, II, III, or IV is guilty of a felony and shall be sentenced to a term of imprisonment for not less than two (2) years nor more than ten (10) years and a fine of not more than Five Thousand Dollars ($5,000.00). Such sentence shall not be subject to statutory provisions for suspended sentences, deferred sentences or probation except where the conviction is for a first offense. The provisions of this paragraph shall be applicable to all cases under this paragraph whether or not judgment and sentence on the effective date of this act have become final.

"3. A substance classified in Schedule V is guilty of a felony and shall be sentenced to a term of imprisonment for not more than five (5) years and a fine of not more than One Thousand Dollars ($1,000.00).

"C. Any person convicted of a second or subsequent violation of this section is punishable by a term of imprisonment twice that otherwise authorized and by twice the fine otherwise authorized. Convictions for second or subsequent violations of this section shall not be subject to statutory provisions for suspended sentences, deferred sentences or probation.

"D. Any person who is at least twenty-one (21) years of age and who violates this section by distributing a controlled dangerous substance to a person under eighteen (18) years of age is punishable by twice the fine and by twice the imprisonment otherwise authorized."

whether the Holy American Church is an established religion, or whether the appellant is a member or minister in that faith, we hold that the State of Oklahoma does have a sufficient compelling interest to prohibit distribution of a controlled dangerous substance to members of the public who do not receive the substance in anticipation of using it as part of the beliefs of an established religion.[8] If we were to accept the appellant's position, virtually any criminal action could be defended by utilization of the religious defense, and individuals could create privileges in the courts not uniformly available to the public.

## II

■ Appellant argues he was denied due process on appeal and that his right to self-representation was violated. Specifically, it is contended that as a result of the trial transcripts being confiscated from his prison cell, he was severely hampered in perfecting his pro se appeal to this Court. We find this contention to be without validity because the appellant's brief discloses that the transcripts were not confiscated until seven months after the time had run to perfect an appeal to this Court.

## III

■ It is also argued that he did not receive a fair trial as prescribed by the United States Constitution. In support of this general proposition, the appellant alleges he was unable to speak to witnesses prior to trial and as a result, was unable to prepare an adequate defense. This allegation is unsupported for the following reason. The trial court issued an order to the Sheriff of Mayes County that the appellant was to be afforded reasonable visitation opportunities with witnesses who were to appear on his behalf. Appellant contends that the jailers did not comply with this order and that the judge committed error in not citing the jailers for contempt. The

only defense witness who testified at the trial was Darrell Briggs. Briggs testified that he was asked to leave the jail at 9:00 p. m., on a Friday and that the visiting hours posted at the jail were from 9:00 a. m. to 11:00 a. m. and 1:00 p. m. until 3:00 p. m. The court order stated that the defendant was to be afforded reasonable visitation hours to be limited only by the manpower capabilities of the jail. We are of the opinion that it was not unreasonable to require witness Briggs to leave the Mayes County jail at 9:00 p. m. since Briggs was a resident in the town in which appellant was incarcerated, and the sheriff permitted him to come to the jail after hours and on the following Saturday.

■ At the post conviction hearing in support of his motion for new trial, the appellant offered the testimony of David Trent and Johnny Meeker who stated they were not allowed to visit with him. Although this testimony might indicate non-compliance with the court's order, it does not reach the issue of a fair trial because neither of these witnesses was subpoenaed to testify at the appellant's trial.

We find appellant's remaining assignments of error to be totally without foundation because they do not challenge the issue of a fair trial. Furthermore, after a close examination of the record and transcript we are unable to find any error which would justify modification or reversal. The judgment and sentence is *AFFIRMED*.

BRETT, J., concurs.

BUSSEY, J., concurs in result.

---

8. Every jurisdiction which has considered whether the use of marihuana is a proper exercise of religious freedom has rejected that concept. See *Lewellyn v. State*, Okl.Cr., 489 P.2d 511 (1971). See also Annot. "Free Exercise of Religion as Defense to Prosecution for Narcotic or Psychedelic Drug Offense," 35 A.L.R.3d 939 (1971).