## EMPLOYMENT DIVISION, DEPARTMENT OF HUMAN RESOURCES OF THE STATE OF OREGON, ET AL. *v.* SMITH

No. 86–946.   Argued December 8, 1987—Decided April 27, 1988*

---

*Together with No. 86–947, *Employment Division, Department of Human Resources of the State of Oregon, et al.* v. *Black,* also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 674. KENNEDY, J., took no part in the consideration or decision of the cases.

*William F. Gary*, Deputy Attorney General of Oregon, argued the cause for petitioners. With him on the briefs were *Dave Frohnmayer*, Attorney General of Oregon, *Virginia L. Linder*, Solicitor General, *Michael D. Reynolds*, Assistant Solicitor General, and *Christine Chute*, Assistant Attorney General.

*Suanne Lovendahl* argued the cause and filed a brief for respondents.†

JUSTICE STEVENS delivered the opinion of the Court.

Respondents are drug and alcohol abuse rehabilitation counselors who were discharged after they ingested peyote, a hallucinogenic drug, during a religious ceremony of the Native American Church. Both applied for and were denied unemployment compensation by petitioner Employment Division. The Oregon Supreme Court held that this denial, al-

†Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation et al. by *Charles A. Horsky, David H. Remes, John A. Powell*, and *David B. Goldstein;* for the American Jewish Congress et al. by *Amy Adelson, Lois C. Waldman*, and *Marc D. Stern;* and for the Native American Church of North America et al. by *Walter R. Echo-Hawk* and *Steven C. Moore.*

though proper as a matter of Oregon law, violated the Free Exercise Clause of the First Amendment to the Federal Constitution.[1] In reaching that conclusion the state court attached no significance to the fact that the possession of peyote is a felony under Oregon law punishable by imprisonment for up to 10 years.[2] Because we are persuaded that the alleged illegality of respondents' conduct is relevant to the constitutional analysis, we granted certiorari, 480 U. S. 916 (1987), and now vacate the judgments and remand for further proceedings.

I

Respondents Alfred Smith and Galen Black were employed by the Douglas County Council on Alcohol and Drug Abuse Prevention and Treatment (ADAPT), a nonprofit corporation that provides treatment for alcohol and drug abusers. Both were qualified to be counselors, in part, because they had former drug and alcohol dependencies. As a matter of policy, ADAPT required its recovering counselors to abstain from the use of alcohol and illegal drugs.[3] ADAPT ter-

---

[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U. S. Const., Amdt. 1.

[2] Ore. Rev. Stat. §§ 475.992(4)(a), 161.605(2) (1987); see 301 Ore. 209, 219, n. 2, 721 P. 2d 445, 450, n. 2 (1986) (quoted in n. 10, *infra*).

[3] This policy reflected ADAPT's treatment philosophy that successful recovery from addiction requires complete abstinence from the use of alcohol and nonprescription drugs. The policy also served to assure that counselors were appropriate role models for their clients. ADAPT's policy statement on drug and alcohol abuse provided, in pertinent part:

"POLICY STATEMENT
ALCOHOL AND OTHER DRUG USE BY EMPLOYEES
"In keeping with our drug-free philosophy of treatment, and our belief in the disease concept of alcoholism, and associated complex issues involved in both alcoholism and drug addiction, we require the following of our employees:
"1. Use of an illegal drug or use of prescription drugs in a nonprescribed manner is grounds for immediate termination from employment.
. . . . .
"3. Any use of alcohol by recovering staff will not be allowed, and is grounds for immediate disciplinary action, up to and including termina-

minated respondents' employment because they violated that policy. As to each of them the violation consisted of a single act of ingesting a small quantity of peyote for sacramental purposes at a ceremony of the Native American Church. It is undisputed that respondents are members of that church, that their religious beliefs are sincere, and that those beliefs motivated the "misconduct" that led to their discharge.

Both respondents applied for unemployment compensation. Petitioner Employment Division considered the applications in a series of administrative hearings and appeals,[4] at the conclusion of which it determined that the applications should be denied.[5] Petitioner considered and rejected respondents' constitutional claim and concluded that they were

---

tion. Use shall be defined as any ingestion of an alcoholic beverage, in *any* situation." App. 11.

[4] Raising identical legal issues and presenting almost identical facts, these two cases proceeded in tandem through state administrative proceedings and through the state courts. They were consolidated upon order of this Court when the State's petitions for certiorari were granted. 480 U. S. 916 (1987).

[5] Each respondent requested a hearing after his application for benefits was denied because he had been discharged for work-related misconduct. After separate hearings, a referee decided that both respondents were entitled to unemployment compensation benefits. In Black's case, the referee held that his ingestion of peyote was "an isolated incident of poor judgment" rather than misconduct. App. 3–5. In Smith's case, the referee concluded that because "there is no evidence in the hearing record to indicate that granting benefits to claimants whose unemployment is caused by adherence to religious beliefs would have any significant impact on the trust fund, it cannot be held that the alleged State interest warrants interference with the claimant's freedom of religion." App. to Pet. for Cert. in No. 86–946, p. A25. On review the Employment Appeals Board disagreed with the referee and concluded that benefits should be denied in both cases. As to Smith, the Board ruled that the State had shown a compelling state interest in denying benefits. That interest was "in the proscription of illegal drugs, not merely in the burden upon the Unemployment Compensation Trust Fund." *Id.*, at A19–A20. In Black's case the Board merely reversed the referee's finding that Black had not been fired for misconduct without reaching the First Amendment issue. App. to Pet. for Cert. in No. 86–947, pp. A23–A24.

ineligible for benefits because they had been discharged for work-related "misconduct."[6]

The Oregon Court of Appeals, considering the constitutional issue en banc, reversed the Board's decisions.[7] The Oregon Supreme Court granted the State's petitions for review in both cases to consider whether the denial of benefits violated the Oregon Constitution[8] or the First Amendment to the Federal Constitution. The cases were argued together, but the court issued separate opinions, fully analyzing the constitutional issues only in *Smith*.

---

[6] Oregon Rev. Stat. § 657.176(2)(a) (1987) provides that "[a]n individual shall be disqualified from the receipt of benefits . . . if . . . the individual . . . [h]as been discharged for misconduct connected with work."

Oregon Admin. Rule 471–30–038(3) (1987) provides:

"Under the provisions of ORS 657.176(2)(a) and (b), misconduct is a wilful violation of the standards of behavior which an employer has the right to expect of an employe. An act that amounts to a wilful disregard of an employer's interest, or recurring negligence which demonstrates wrongful intent is misconduct. Isolated instances of poor judgment, good faith errors, unavoidable accidents, absences due to illness or other physical or mental disabilities, or mere inefficiency resulting from lack of job skills or experience are not misconduct for purposes of denying benefits under ORS 657.176."

[7] In Black's case the majority concluded that the denial of benefits to persons who were discharged for engaging in a religious act constituted a substantial burden on free exercise rights that was not justified by the State's interest in protecting the Unemployment Compensation Fund from depletion and remanded for further factual findings on the religious nature of respondent's conduct. The dissenting judges expressed the opinion that because the ingestion of peyote was prohibited by Oregon law respondent had no protectible constitutional right on which to base his claim. 75 Ore. App. 735, 707 P. 2d 1274 (1985). Smith's case was reversed and remanded for further consideration in light of the decision in *Black*. 75 Ore. App. 764, 709 P. 2d 246 (1985).

[8] Article I of the Oregon Constitution provides, in part:

"Section 2. Freedom of worship. All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.

"Section 3. Freedom of religious opinion. No law shall in any case whatever control the free exercise, and enjoyment of religious opinions, or interfere with the rights of conscience."

In accordance with its usual practice,[9] the court first addressed the Oregon constitutional issue. The court concluded:

> "Under the Oregon Constitution's freedom of religion provisions, claimant has not shown that his right to worship according to the dictates of his conscience has been infringed upon by the denial of unemployment benefits. We do not imply that a governmental rule or policy disqualifying a person from employment or from public services or benefits by reason of conduct that rests on a religious belief or a religious practice could not impinge on the religious freedom guaranteed by Article I, sections 2 and 3. Nor do we revive a distinction between constitutional 'rights' and 'privileges.' But here it was not the government that disqualified claimant from his job for ingesting peyote. And the rule denying unemployment benefits to one who loses his job for what an employer permissibly considers misconduct, conduct incompatible with doing the job, is itself a neutral rule, as we have said. As long as disqualification by reason of the religiously based conduct is peculiar to the particular employment and most other jobs remain open to the worker, we do not believe that the state is denying the worker a vital necessity in applying the 'misconduct' exception of the unemployment compensation law." 301 Ore. 209, 216, 721 P. 2d 445, 448–449 (1986).

Turning to the federal issue, the court reasoned that our decisions in *Sherbert* v. *Verner*, 374 U. S. 398 (1963), and

---

[9] The Oregon Supreme Court stated in *Sterling* v. *Cupp*, 290 Ore. 611, 614, 625 P. 2d 123, 126 (1981):

"The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law."

See also Linde, E Pluribus—Constitutional Theory and State Courts, 18 Ga. L. Rev. 165, 178–179 (1984).

*Thomas* v. *Review Bd., Indiana Employment Security Div.*, 450 U. S. 707 (1981), required it to hold that the denial of unemployment benefits significantly burdened respondent's religious freedom. The court also concluded that the State's interest in denying benefits was not greater in this case than in *Sherbert* or *Thomas*. This conclusion rested on the premise that the Board had erroneously relied on the State's interest in proscribing the use of dangerous drugs rather than just its interest in the financial integrity of the compensation fund. Whether the state court believed that it was constrained by *Sherbert* and *Thomas* to disregard the State's law enforcement interest, or did so because it believed petitioner to have conceded that the legality of respondent's conduct was not in issue, is not entirely clear. The relevant paragraph in the court's opinion reads as follows:

> "Nor is the state's interest in this case a more 'overriding' or 'compelling' interest than in *Sherbert* and *Thomas*. The Board found that the state's interest in proscribing the use of dangerous drugs was the compelling interest that justified denying the claimant unemployment benefits. However, the legality of ingesting peyote does not affect our analysis of the state's interest. The state's interest in denying unemployment benefits to a claimant discharged for religiously motivated misconduct must be found in the unemployment compensation statutes, not in the criminal statutes proscribing the use of peyote. The Employment Division concedes that 'the commission of an illegal act is not, in and of itself, grounds for disqualification from unemployment benefits. ORS 657.176(3) permits disqualification only if a claimant commits a felony in connection with work . . . . [T]he legality of [claimant's] ingestion of peyote has little direct bearing on this case." 301 Ore., at 218–219, 721 P. 2d, at 450.

The court noted that although the possession of peyote is a crime in Oregon, such possession is lawful in many jurisdictions.[10]

In its opinion in *Black*, the court rejected the Court of Appeals' conclusion that the case should be remanded for factual findings on the religious character of respondent's peyote use. Although the referee's findings concerning the use of peyote were somewhat sparse, the court found them sufficient to support the conclusions that the Native American Church is a recognized religion, that peyote is a sacrament of that church, and that respondent's beliefs were sincerely held. The court noted that other courts had acknowledged the role of peyote in the Native American Church and quoted at length from a decision of the California Supreme Court.[11]

---

[10] The court commented in a footnote:

"Under ORS 475.992(4) and OAR 855–80–020, the possession of peyote is a crime. Peyote (*Lophophora williamsii*) is a cactus that 'contains a number of active alkaloids with varying properties; the chief hallucinogen among these alkaloids is mescaline.' Note, *Hallucinogens*, 68 Colum L Rev 521, 525 (1968). The Oregon Court of Appeals, construing a previous statute, has held that religious users of peyote are not exempt from criminal sanctions. *State* v. *Soto*, 21 Or App 794, 537 P2d 142 (1975), *cert den* 424 US 955 (1976). The federal government and several states exempt the religious use of peyote through caselaw, statute or regulation. *See State* v. *Whittingham*, 19 Ariz App 27, 504 P2d 950 (1973), *cert den* 417 US 946 (1974); *People* v. *Woody*, 61 Cal 2d 716, 40 Cal Rptr 69, 394 P2d 813 (1964); *Whitehorn* v. *State*, 561 P2d 539 (Okla Crim App 1977); 21 CFR § 1307.31 (1985); Iowa Code Ann § 204.204(8) (1986); NM Stat Ann § 30–31–6(D) (1980); SD Comp Laws Ann § 34–20B-14(17) (1977); Tex Stat Ann 4476–15 § 4.11 (1976)." 301 Ore., at 219, n. 2, 721 P. 2d, at 450, n. 2.

[11] 301 Ore. 221, 225–227, 721 P. 2d 451, 453–454 (1986), quoting *People* v. *Woody*, 61 Cal. 2d 716, 720–721, 394 P. 2d 813, 817–818 (1964):

"'Peyote, as we shall see, plays a central role in the ceremony and practice of the Native American Church, a religious organization of Indians. Although the church claims no official prerequisites to membership, no written membership rolls and no recorded theology, estimates of its membership range from 30,000 to 250,000, the wide variance deriving from differing definitions of a "member." As the anthropologists have ascertained through conversations with members, the theology of the church combines

This extensive quotation from an opinion that explains why the religious use of peyote is permitted in California raises the question whether the Oregon court might reach a similar conclusion.

certain Christian teachings with the belief that peyote embodies the Holy Spirit and that those who partake of peyote enter into direct contact with God.

"'Peyotism discloses a long history. A reference to the religious use of peyote in Mexico appears in Spanish historical sources as early as 1560. Peyotism spread from Mexico to the United States and Canada; American anthropologists describe it as well established in this country during the latter part of the nineteenth century. Today, Indians of many tribes practice Peyotism. Despite the absence of recorded dogma, the several tribes follow surprisingly similar ritual and theology; the practices of Navajo members in Arizona practically parallel those of adherents in California, Montana, Oklahoma, Wisconsin, and Saskatchewan.

"'The "meeting," a ceremony marked by the sacramental use of peyote, composes the cornerstone of the peyote religion. The meeting convenes in an enclosure and continues from sundown Saturday to sunrise Sunday. To give thanks for the past good fortune or find guidance for future conduct, a member will "sponsor" a meeting and supply to those who attend both the peyote and the next morning's breakfast. The "sponsor," usually but not always the "leader," takes charge of the meeting; he decides the order of events and the amount of peyote to be consumed. Although the individual leader exercises an absolute control of the meeting, anthropologists report a striking uniformity of its ritual.

"'A meeting connotes a solemn and special occasion. Whole families attend together, although children and young women participate only by their presence. Adherents don their finest clothing, usually suits for men and fancy dresses for the women, but sometimes ceremonial Indian costumes. At the meeting the members pray, sing, and make ritual use of drum, fan, eagle bone, whistle, rattle and prayer cigarette, the symbolic emblems of their faith. The central event, of course, consists of the use of peyote in quantities sufficient to produce an hallucinatory state.

"'At an early but fixed stage in the ritual the members pass around a ceremonial bag of peyote buttons. Each adult may take four, the customary number, or take none. The participants chew the buttons, usually with some difficulty because of extreme bitterness; later, at a set time in the ceremony any member may ask for more peyote; occasionally a member may take as many as four more buttons. At sunrise on Sunday the ritual ends; after a brief outdoor prayer, the host and his family serve

## II

Respondents contend that the sacramental use of small quantities of peyote in the Native American Church is comparable to the sacramental use of small quantities of alcohol in Christian religious ceremonies. Even though the State may generally prohibit the use of hallucinogenic drugs and alcohol for recreational purposes and strictly regulate their use for medicinal purposes, respondents assert that the Constitution requires some measure of accommodation for religious use. Alternatively, they argue that Oregon's general prohibition against the possession of peyote is not applicable to its use in a genuine religious ceremony. Even if peyote use is a crime in Oregon, since the State does not administer its unemployment compensation program for law enforcement purposes, they conclude that our decisions in *Sherbert* and *Thomas* require that they be awarded benefits.

The Oregon Supreme Court agreed with respondents' conclusion, but it did not endorse all of their reasoning. The state court appears to have assumed, without specifically deciding, that respondents' conduct was unlawful. That assumption did not influence the court's disposition of the cases because, as a matter of state law, the commission of an illegal act is not itself a ground for disqualifying a discharged employee from benefits. It does not necessarily follow, how-

---

breakfast. Then the members depart. By morning the effects of the peyote disappear; the users suffer no after-effects.

"'Although peyote serves as a sacramental symbol similar to bread and wine in certain Christian churches, it is more than a sacrament. Peyote constitutes in itself an object of worship; prayers are directed to it much as prayers are devoted to the Holy Ghost. On the other hand, to use peyote for nonreligious purposes is sacrilegious. Members of the church regard peyote also as a "teacher" because it induces a feeling of brotherhood with other members; indeed it enables the participant to experience the Deity. Finally, devotees treat peyote as a "protector." Much as a Catholic carries his medallion, an Indian G. I. often wears around his neck a beautifully beaded pouch containing one large peyote button'" (footnote omitted).

ever, that the illegality of an employee's misconduct is irrelevant to the analysis of the federal constitutional claim. For if a State has prohibited through its criminal laws certain kinds of religiously motivated conduct without violating the First Amendment, it certainly follows that it may impose the lesser burden of denying unemployment compensation benefits to persons who engage in that conduct.

There is no absolute "constitutional right to unemployment benefits on the part of all persons whose religious convictions are the cause of their unemployment." *Sherbert* v. *Verner*, 374 U. S., at 409–410. On three separate occasions, however, we have held that an employee who is required to choose between fidelity to religious belief and cessation of work may not be denied unemployment compensation because he or she is faithful to the tenets of his or her church. As we explained in *Sherbert:*

> "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.*, at 404.

In *Sherbert*, as in *Thomas* and *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 142 (1987), the conduct that gave rise to the termination of employment was perfectly legal;[12] indeed, the Court assumed that it was immune from state regulation.[13]

---

[12] In *Sherbert* v. *Verner,* the appellant was discharged because she would not work on Saturday, the Sabbath Day of her faith. When the petitioner in *Thomas* v. *Review Bd., Indiana Employment Security Div.*, 450 U. S. 707 (1981), was required to work on turrets for military tanks, he terminated his employment because his religious beliefs prevented him from participating in the production of war materials. And in *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, the appellant's religion precluded work between sundown on Friday and sundown on Saturday; she was discharged because she therefore could not work all of her scheduled shifts.

[13] The distinction between the absolute constitutional protection against governmental regulation of religious beliefs on the one hand, and the quali-

The results we reached in *Sherbert*, *Thomas*, and *Hobbie* might well have been different if the employees had been discharged for engaging in criminal conduct. We have held that bigamy may be forbidden, even when the practice is dictated by sincere religious convictions. *Reynolds* v. *United States*, 98 U. S. 145 (1879). If a bigamist may be sent to jail despite the religious motivation for his misconduct, surely a State may refuse to pay unemployment compensation to a marriage counselor who was discharged because he or she entered into a bigamous relationship. The protection that the First Amendment provides to "'*legitimate* claims to the free exercise of religion,'" see *Hobbie*, 480 U. S., at 142 (quoting *Wisconsin* v. *Yoder*, 406 U. S. 205, 215 (1972)) (emphasis added), does not extend to conduct that a State has validly proscribed.

---

fied protection against the regulation of religiously motivated conduct, on the other, was carefully explained in our opinion in *Sherbert*:

"The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such, *Cantwell* v. *Connecticut*, 310 U. S. 296, 303. Government may neither compel affirmation of a repugnant belief, *Torcaso* v. *Watkins*, 367 U. S. 488; nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities, *Fowler* v. *Rhode Island*, 345 U. S. 67; nor employ the taxing power to inhibit the dissemination of particular religious views, *Murdock* v. *Pennsylvania*, 319 U. S. 105; *Follett* v. *McCormick*, 321 U. S. 573; cf. *Grosjean* v. *American Press Co.*, 297 U. S. 233. On the other hand, the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions.' *Braunfeld* v. *Brown*, 366 U. S. 599, 603. The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order. See, *e. g.*, *Reynolds* v. *United States*, 98 U. S. 145; *Jacobson* v. *Massachusetts*, 197 U. S. 11; *Prince* v. *Massachusetts*, 321 U. S. 158; *Cleveland* v. *United States*, 329 U. S. 14.

"Plainly enough, appellant's conscientious objection to Saturday work constitutes no conduct prompted by religious principles of a kind within the reach of state legislation." 374 U. S., at 402–403.

Neither the Oregon Supreme Court nor this Court has confronted the question whether the ingestion of peyote for sincerely held religious reasons is a form of conduct that is protected by the Federal Constitution from the reach of a State's criminal laws. It may ultimately be necessary to answer that federal question in this case, but it is inappropriate to do so without first receiving further guidance concerning the status of the practice as a matter of Oregon law.[14] A substantial number of jurisdictions have exempted the use of peyote in religious ceremonies from legislative prohibitions against the use and possession of controlled substances.[15] If Oregon is one of those States, respondents' conduct may well be entitled to constitutional protection. On the other hand, if Oregon does prohibit the religious use of peyote, and if that prohibition is consistent with the Federal Constitution, there is no federal right to engage in that conduct in Oregon. If that is the case, the State is free to withhold unemployment compensation from respondents for engaging in work-related misconduct, despite its religious motivation. Thus, paradoxical as it may first appear, a necessary predicate to a correct evaluation of respondents' federal claim is an understanding of the legality of their conduct as a matter of state law.

Relying on the fact that Oregon statutes prohibit the possession of peyote, see Ore. Rev. Stat. § 475.992(4) (1987), rather than its use, and the further fact that the Oregon Court of Appeals held that the ingestion of a controlled sub-

---

[14] See nn. 10 and 11, *supra.*

[15] See 21 CFR § 1307.31 (1987) (exempting use of peyote in bona fide religious ceremonies of the Native American Church); Iowa Code § 204.204 (8) (1985) (same); N. M. Stat. Ann. § 30–31–6(D) (1987) (exempting use of peyote in bona fide religious ceremonies by bona fide religious organizations); S. D. Codified Laws § 34–20B-14(17) (1987) (exempting sacramental use of peyote in services of the Native American Church); Tex. Rev. Civ. Stat. Ann., Art. 4476–15 § 4.11 (Supp. 1988) (exempting use of peyote by Native American Church members with not less than 25% Indian blood in bona fide religious ceremonies). These authorities were cited by the Oregon Supreme Court. See n. 10, *supra.*

stance into the bloodstream did not constitute "possession" within the meaning of the predecessor statute, *State* v. *Downes*, 31 Ore. App. 1183, 572 P. 2d 1328 (1977), respondents argue that their ceremonial use of the drug was not unlawful.[16] The Attorney General of the State advises us that this argument is without merit. But in the absence of a definitive ruling by the Oregon Supreme Court we are unwilling to disregard the possibility that the State's legislation regulating the use of controlled substances may be construed to permit peyotism or that the State's Constitution may be interpreted to protect the practice.[17] That the Oregon Supreme Court's opinions in these cases not only noted that other States "exempt the religious use of peyote through caselaw,"[18] but also quoted extensively from a California opinion that did so, lends credence to the possibility that this conduct may be lawful in Oregon.

Because we are uncertain about the legality of the religious use of peyote in Oregon, it is not now appropriate for us to decide whether the practice is protected by the Federal Constitution. See *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring). The possibility that respondents' conduct would be unprotected if it violated the State's criminal code is, however, sufficient to counsel against affirming the state court's holding that the Federal Constitution requires the award of benefits to these respondents. If the Oregon Supreme Court's holding rests on the

---

[16] At the time *Downes* was decided, Oregon law proscribed both the use and possession of controlled substances. In 1977, the Oregon Legislature passed the Uniform Controlled Substances Act, Ore. Rev. Stat. § 475.005 *et seq.* (1987), which repealed the use and possession statutes discussed in *Downes* and enacted a provision that addresses only the possession of controlled substances. See § 475.992(4).

[17] Our concern, of course, is not with whether some fact unique to respondents' cases bars their prosecution, but with whether Oregon law provides a general exemption from the scope of its criminal laws for the religious use of peyote.

[18] See n. 10, *supra*.

unstated premise that respondents' conduct is entitled to the same measure of federal constitutional protection regardless of its criminality, that holding is erroneous. · If, on the other hand, it rests on the unstated premise that the conduct is not unlawful in Oregon, the explanation of that premise would make it more difficult to distinguish our holdings in *Sherbert*, *Thomas*, and *Hobbie*. We therefore vacate the judgments of the Oregon Supreme Court and remand the cases for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of these cases.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Respondents Smith and Black were fired for practicing their religion. The Employment Division of the Oregon Department of Human Resources deemed respondents' worship "misconduct connected with work," Ore. Rev. Stat. § 657.176(2)(a) (1987), and accordingly denied them unemployment benefits. Citing a "compelling state interest . . . in the proscription of illegal drugs," the Employment Appeals Board rejected the assertion that the Free Exercise Clause prohibited the denial of unemployment benefits to an employee discharged for religious use of peyote. App. to Pet. for Cert. in No. 86–946, p. A20. The Oregon Supreme Court, disavowing any state interest in enforcing its criminal laws through the denial of unemployment benefits, found the State's interest indistinguishable from those asserted in *Sherbert* v. *Verner*, 374 U. S. 398, 403 (1963), and *Thomas* v. *Review Bd., Indiana Employment Security Div.*, 450 U. S. 707 (1981). On the authority of those cases it held that the denial violated respondents' First Amendment right to exercise their religion freely. *Smith* v. *Employment Division*, 301 Ore. 209, 212, 721 P. 2d 445, 446 (1986); *Black* v. *Em-*

*ployment Division,* 301 Ore. 221, 721 P. 2d 451 (1986). This Court today strains the state court's opinion to transform the straightforward question that is presented into a question of first impression that is not.

A generation ago, we established that a State may not deny unemployment benefits to an employee discharged for her adherence to religious practices unless the "incidental burden on the free exercise of [her] religion [is] justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . . . '" *Sherbert, supra,* at 403 (citation omitted). In *Thomas, supra,* and again as recently as last Term, see *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U. S. 142 (1987), we reaffirmed *Sherbert's* holding that, where the "'state . . . denies . . . a benefit because of conduct mandated by religious belief,'" the resultant burden on the free exercise of religion "must be subjected to strict scrutiny and could be justified only by proof by the State of a compelling interest." 480 U. S., at 141 (quoting *Thomas, supra,* at 717–718) (emphasis omitted). Where the burden on religion is imposed pursuant to a statute, we have an independent obligation to ascertain that the legislature in fact intended to advance the asserted interest through the statutory scheme. Cf. *Sherbert, supra,* at 407. We may not, particularly when engaging in strict scrutiny, blindly accept the interest that the State asserts in court. See, *e. g., Mississippi University for Women* v. *Hogan,* 458 U. S. 718, 730 (1982) (all-women state university fails intermediate scrutiny because, "although the State recited a 'benign, compensatory purpose,' it failed to establish that the alleged objective is the actual purpose underlying the discriminatory [statutory] classification") (footnote omitted); *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 103–104 (1976) ("When the Federal Government asserts an overriding national interest as justification for a discriminatory rule . . . , due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that

interest"); *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 648, n. 16 (1975) (under rationality review, "[t]his Court need not . . . accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation").

Smith and Black—like Sherbert, Thomas, and Hobbie— were discharged from their employment because their religious practices conflicted with their employer's interests. The only difference between the cases before us and the situations we faced in *Sherbert*, *Thomas*, and *Hobbie* is that here the Employment Division has asserted in court a "'compelling state interest . . . in the proscription of illegal drugs,'" not merely the interest in avoiding the financial "'burden upon the Unemployment Compensation Trust Fund'" that we found not compelling in *Sherbert*. *Smith, supra*, at 212, 721 P. 2d, at 446 (quoting opinion of Employment Appeals Board). Such an interest in criminal law enforcement would present a novel issue if it were in fact an interest that Oregon had sought to advance in its unemployment compensation statute.

Far from validating any such state interest, however, the State's highest court has disavowed it. In the paragraph that this Court quotes at length, *ante*, at 666, the Oregon Supreme Court could scarcely have been clearer. The state court understood that the Employment Division may not overcome the burden on religion by invoking a theoretically plausible interest that in fact the state legislature had no intention of furthering when it enacted the unemployment compensation statute: "The state's interest in denying unemployment benefits to a claimant discharged for religiously motivated misconduct must be found in the unemployment compensation statutes, not in the criminal statutes proscribing the use of peyote." *Smith, supra*, at 219, 721 P. 2d at 450 (footnote omitted); see also *Black, supra*, (relying on *Smith*'s analysis). The state court could find no legislative

intent expressed in the unemployment statute to reinforce criminal drug-abuse laws. Although we are not bound by a state-court determination that a state legislature was actually motivated by a particular validating purpose, see *Stone* v. *Graham*, 449 U. S. 39, 41 (1980), we have never attributed to a state legislature a validating purpose that the State's highest court could find nowhere in the statute. To do so would be inconsistent with our responsibility to scrutinize strictly state-imposed burdens on fundamental rights. At any rate, this Court offers no reason to discount the Oregon Supreme Court's disavowal of the validating purpose. Nor has the Employment Division asserted any further interest other than those that *Sherbert*, *Thomas*, and *Hobbie* have rejected. I would therefore affirm the Oregon Supreme Court.

The Court avoids this straightforward analysis, proclaiming instead that it has difficulty discerning "[w]hether the state court believed that it was constrained by *Sherbert* and *Thomas* to disregard the State's law enforcement interest, or did so because it believed petitioner to have conceded that the legality of respondent's conduct was not in issue," *ante*, at 666. The difficulty, however, is entirely of this Court's own making, for it poses two entirely implausible interpretations of the opinions below and overlooks the only natural one.

The Oregon Supreme Court both introduced and concluded the relevant passage by stressing the *similarity* between the state interests asserted here and those asserted in *Sherbert* and *Thomas*. See *Smith*, 301 Ore., at 218, 721 P. 2d, at 450 (the "state's interest in this case [is no] more 'overriding' or 'compelling' . . . than in *Sherbert* and *Thomas*"); *id.*, at 219–220, 721 P. 2d, at 450–451 ("The state's interest is simply the financial interest in the payment of benefits from the unemployment insurance fund to this claimant and other claimants similarly situated," which "*Sherbert* and *Thomas* did not find . . . 'compelling' when weighed against the free exercise rights of the claimant"). At no point in the comparison did

the state court suggest, as this Court's first alternative interpretation does, that it could discern an additional state interest (namely, the interest in enforcing criminal drug-abuse laws) that *Sherbert* and *Thomas* "constrained" it to "disregard." Moreover, the state court did not so much as suggest why *Sherbert* and *Thomas* would so constrain the State. Even the State's attorney could not in good conscience offer the interpretation that this Court adopts, without the caveat "that it is not entirely apparent from the face of the opinion," Tr. of Oral Arg. 7.

Nor is it accurate to read the passage, as this Court's second alternative interpretation does, as merely binding the Employment Division to a concession "that the legality of respondent's conduct was not in issue." The Employment Division conceded only the patently obvious point that the asserted interest in criminal law enforcement is nowhere to "be found in the unemployment compensation statutes," 301 Ore., at 219, 721 P. 2d, at 450, and that the legality of peyote use was therefore irrelevant to the determination whether the *statute* purported to deny benefits. The Employment Division hotly disputed the proposition that it could not answer respondents' *free exercise challenge* by asserting an interest that appears nowhere in its unemployment compensation scheme. The very passage that the Court quotes demonstrates as much: "The Board found that the state's interest in proscribing the use of dangerous drugs was the compelling interest that justified denying the claimant unemployment benefits." *Id.*, at 218–219, 721 P. 2d, at 450. The remand in these cases thus rests on a purported ambiguity that has no basis in the opinions below.

Perhaps more puzzling than the imagined ambiguity is the Court's silence as to its relevance. The Court merely remands these cases to the Oregon Supreme Court for further proceedings after concluding that a "necessary predicate" to its analysis is a pronouncement by the state court on whether respondents' conduct was criminal. *Ante,* at 672. It seems

to me that the state court on remand could readily resolve these cases without reaching that issue. The Court has expressed no intention to depart from the longstanding rule that, in strictly scrutinizing state-imposed burdens on fundamental rights, courts may not assert on a State's behalf interests that the State does not have. See *supra*, at 675–676. Accordingly, I must assume that the Court has tacitly left the Oregon Supreme Court the option to dispose of these cases by simply reiterating its initial opinion and appending, "and we really mean it," or words to that effect.

A slot on this Court's calendar is both precious and costly. Inevitably, each Term this Court discovers only after painstaking briefing and oral argument that some cases do not squarely present the issues that the Court sought to resolve. There is always the temptation to trivialize the defect and decide the novel case that we *thought* we had undertaken rather than the virtual clone of precedent that we *actually* undertook. Here, however, the Court's belated effort to recoup sunk costs is not worth the price. Today's foray into the realm of the hypothetical will surely cost us the respect of the State Supreme Court whose words we misconstrue. That price is particularly exorbitant where, as here, the state court is most likely to respond to our efforts by merely reiterating what it has already stated with unmistakable clarity.

I dissent.